# STATE v. RUDOLPH KENNETH ELLIS.

136 N. W. (2d) 384.

June 18, 1965—No. 39,136.

*Cochrane, Thomson & Bresnahan,* for appellant.

*Walter F. Mondale,* Attorney General, *J. Earl Cudd,* Solicitor General, and *Leland A. Olson,* County Attorney, for respondent.

THOMAS GALLAGHER, JUSTICE.

Defendant was convicted of assault in the first degree as defined in Minn. St. 1961, § 619.37,[1] and one prior felony conviction. The ver-

---

[1]Minn. St. 1961, § 619.37, provides: "Every person who, with intent to kill a human being or to commit a felony upon the person or property of the one assaulted or of another:

dict of guilty was returned on April 26, 1963. On April 27, 1963, he moved for judgment of acquittal or for a new trial. This is an appeal from an order of the district court dated May 27, 1963, denying that motion.

On appeal, defendant contends that (1) the evidence was insufficient to sustain his conviction; (2) in his trial prejudicial error was committed as follows: (a) In allowing the sheriff to be present in chambers at time of motion by defendant and in talking to juror after he had testified; (b) in denying defendant's motion for a change of venue; (c) in failing to grant defendant's motion for sequestration of the witnesses; (d) in admitting testimony with respect to a statement claimed to have been made by defendant upon his arrest; (e) in denying request of his counsel for additional time to prepare his final argument; and (f) in failing to declare a mistrial because of improper statements by counsel for the state in his closing argument.

Defendant was arrested at about 5 a. m. on September 23, 1962, after he had been involved in an automobile accident and had been shot by an arresting police officer near St. Cloud. At that time he owned and was driving a 1959 black Pontiac automobile bearing license number 4U-8140. Prior thereto at about 3 a. m. on the same date, Willmar Police Officer William M. Van Ort had been shot by an unknown assailant at Willmar; and at about 4:20 a. m., Eden Valley Police Officer Edward Eades had been shot near Eden Valley. It was undisputed that the bullets in both shootings were fired from the same gun, a .22-caliber firearm. Officer Eades died on October 8, 1962, shortly following surgery for the removal of a .22-caliber bullet from his neck.

With respect to the Willmar shooting, Police Officer Leon G. Wiese testified that between 11:10 p. m. and 11:30 p. m., September 22,

---

"(1) Shall assault another with a loaded firearm or any other deadly weapon, or by any force or means likely to produce death; or

"(2) Shall administer or cause to be administered to, or taken by, another, poison or any other destructive or noxious thing, so as to endanger the life of such other person—

"Shall be guilty of assault in the first degree, and be punished by imprisonment in the state prison for not less than five, nor more than ten, years." (Repealed by L. 1963, c. 753, art. II, § 17.)

1962, he had observed a 1959 Pontiac, license number 4U-8140, on the streets of Willmar with a colored man "behind the wheel" and that defendant, who was colored and then in the courtroom, "looks very much like him." He identified a picture of defendant's Pontiac automobile as the car which he had seen on that occasion. On cross-examination, he testified that he had not made a notation of the license number at the time he first saw the automobile but that when he had called Sergeant John W. Jacobs of the Willmar Police Department the following morning he had reported it and had also then conveyed the same information to the Willmar chief of police; that this had been done after he had heard that a colored man had been apprehended driving a Pontiac with this license number early the following morning near St. Cloud.

Alphonse Jager, a locomotive engineer employed by the Great Northern Railway Company at Willmar, testified that on September 23, 1962, at about 3 a. m., he had been engaged in operating a switch engine in the Willmar railroad yards; that he had stopped his engine so that he and his fireman, Virgil Fosso, could eat their lunch; that as they were seated in the engine cab, facing south, they were in sight of a parking lot on Pacific Avenue near the railroad yards and that on the south side of Pacific Avenue a tavern known as "Vern's" was also in view; that as he glanced toward Vern's while eating, he had seen a man standing on the corner, look around, and quickly go toward the tavern's front entrance and attempt to open it; that he had then observed this man go around the corner of the tavern, where he had disappeared from view; that shortly afterwards he had observed the same man run around the corner and enter the parking lot described; that he had next observed an automobile coming out of this lot at a high rate of speed without lights, which automobile had turned west on Pacific Avenue; that he had then gone into the depot and requested that police be called because of his belief that Vern's had been broken into; and that, at the time, he thought the car he had observed was a 1959 Chevrolet but that a 1959 Pontiac which he had observed later at the sheriff's office had taillights similar to those on the car which came out of the parking lot. He identified exhibit C, a jacket belonging to defendant, as of the same color and type as that worn

by the man he had observed at the time. Virgil Fosso, the fireman, testified that he had observed the incidents described by Jager and corroborated the latter's testimony in other respects.

John Richard Anderson, a Willmar police officer, testified that at about 3:20 a. m., September 23, 1962, he had received a call from the Great Northern depot and had then dispatched Sanford Larson of the Willmar police to Vern's bar; that at about 3:25 a. m. Larson had reported that he had discovered that Willmar Police Officer William Van Ort had been shot near Vern's bar; that he (the witness) had immediately relayed this information to police stations in cities in the vicinity and to Marshall, Minnesota, where a police radio station is located; that at that time, pursuant to information given him by other witnesses, he had described the car as a 1959 Chevrolet.

Officer William Van Ort testified that at about 3 a. m. on September 23, 1962, as he was checking doors and policing the rear of Vern's bar, he had suddenly observed a flash of light and felt something hit him on his right side and had then seen the silhouette of a man wearing a jacket which was similar to that taken from defendant; that he next recalled Officer Sanford Larson coming to his assistance when he had been taken to the hospital where a bullet was found lodged in the soft tissue of his back which had later been removed by Dr. Lloyd Gilman.

Officer Sanford Larson testified that at about 3 a. m., September 23, 1962, in response to instructions from Officer Anderson, he had driven to Vern's bar where he had checked its front and side doors and that as he stepped from the rear door into the alley he found Officer Van Ort lying on the ground and observed that he had been shot.

Gerald J. Veenhuis, dispatcher, Meeker County sheriff's office, Litchfield, Minnesota, testified that he had intercepted a call from Willmar to the St. Paul Highway Patrol at about 3:25 a. m., September 23, 1962, and that in consequence he had made contact with two patrol cars that could be reached by the radio, one at Dassel and one at Litchfield; that he had then called the sheriff of Meeker County and pursuant to the latter's instructions then (at 3:44 a. m.) called Deputy Sheriff Eades at Eden Valley (located at the intersection of Highways

Nos. 22 and 55, 40 miles northeast of Willmar and 32 miles southwest of St. Cloud); that he had then told Eades to be on the lookout for a green Pontiac; that at 4:26 a. m., Eades had called the Litchfield sheriff's office and after receiving this call Veenhuis had called all stations to be on the lookout for a Pontiac with license number 4U-8140.

Police Officer Alois Nistler of Eden Valley testified that he had been with Deputy Sheriff Eades in the early morning of September 23 at the intersection of Highways Nos. 22 and 55; that they had arrived at this intersection at about 4:18 a. m. and had waited there but a short time when they observed a car coming toward them from the west on Highway No. 55; that after this car had passed through the intersection, he and Eades had started out after it in the latter's car with a red signal light in the front windshield operating; that they had caught up to it about 1½ blocks east of the intersection and that after both cars had come to a stop, Eades had left his car from its left side and had called out to the driver of the other car, "Get out of your car, please, with your hands up"; that this driver had then left his car and said something to the effect that, "Well, here I am. You put up your hands"; that Eades then was armed with a shotgun and a revolver; and that there was good light at the time. He identified defendant in the courtroom as the man who had left the other car and testified that defendant had been wearing an army jacket similar to exhibit C; that defendant had then fired six or seven shots at Eades, the bullets striking Eades in his mouth, his left hand, and his knuckles; that after four of such shots had been fired, the witness had heard two loud reports which apparently had come from the shotgun carried by Eades; that there also had been some additional firing from Eades' revolver; that defendant had walked toward the rear of his car while firing and had then fired a shot at him (the witness), hitting him on his finger; that defendant then went between the cars into the ditch and to the rear of the sheriff's car, then ran forward and shoved him (the witness) against the front end of the sheriff's car and then jumped into his own car and drove off; that Eades had then fired a few shots after the car and followed it for about 150 feet in the sheriff's car; that Eades had then turned around to go to the hospital at Litchfield; that as they first

followed defendant's car, which was a black Pontiac, Eades had written its license number—4U-8140—on his pad and later on the way to the hospital had called this number into the sheriff's office and identified it as the car involved in the shooting at the intersection. The witness also testified that he had later observed the same car in the police garage after it had been taken from defendant.

. Lieutenant Harold Olson of the St. Cloud Police Department testified that in the early morning of September 23, 1962, at about 5 a. m., while he was on duty in a police squad car equipped with radio transmitter and receiver, he had received a message to be on the lookout for a Pontiac, license number 4U-8140, which might be coming toward St. Cloud on Highway No. 15; that pursuant to this message, he had set up a roadblock at the junction of Highways Nos. 15 and 152 just southwest of St. Cloud; that three other squad cars were also at this roadblock; that Police Officers Koetter and Schwankel were in one of such cars and Police Officers Becker and Tholl were each in other cars; that after he had been at this roadblock for about 40 minutes, he had observed a car coming toward it from the south on Highway No. 152 at a distance of about a quarter of a mile and traveling at a speed of about 80 miles per hour; that this car had then proceeded through the stop sign at the junction and continued northwesterly on Highway No. 152 for about 2½ blocks and thence west on Highway No. 52; that he had started in pursuit of it in his squad car with its domelight flashing; that the other squad cars also started in pursuit of it behind his car; that when he was about 1½ blocks to its rear as it proceeded west on Highway No. 52, his squad car was traveling about 115 miles per hour; that as he followed the other car for about 3 miles on Highway No. 52, it was traveling at a speed of about 100 miles per hour; that as it traveled west it overtook an Oldsmobile automobile traveling west on Highway No. 52 with which it had collided, stopping just as the squad cars arrived. He identified defendant in court as the driver of the pursued car, which he described as a Pontiac with license number 4U-8140. He testified further that after it had stopped as a result of the collision, he had observed defendant get out of it with his right hand in his jacket pocket and run across the highway toward Officer

Becker; that he then heard a shot and saw Becker grappling with defendant; that Becker then pushed defendant toward the front of his squad car but that defendant had again started back toward Becker with his right hand still in his pocket; that at this time the witness had shot defendant, who fell to the highway; that after checking on the other car he had returned and said to defendant, "You son of a bitch, you're going to die. What did you do with the gun you shot the other two officers with?" and defendant had replied, "I threw it away"; that his own revolver had been in his holster at the time and that he had made no threats to defendant at any time.

Police Officer Kenneth Becker testified that he was present early in the morning of September 23, 1962, at the roadblock at the intersection of Highways Nos. 152 and 15; that he had observed a 1959 Pontiac approaching the roadblock from the south, which car proceeded through the roadblock and turned west on Highway No. 52, the officer giving chase in his squad car; that after he arrived at the point where this car was stopped on Highway No. 52, he stepped out of his squad car and that as he did so the driver of the Pontiac (whom he identified as defendant) left his car with his hand in his pocket so that the pocket protruded; that he had then shouted for defendant to stop but the latter had turned and ran toward him with his hand in his pocket, shouting "Shoot me. Shoot me"; that as defendant continued toward him he had fired his shotgun at defendant's feet; that defendant had then placed his left hand on the shotgun and Becker had pushed defendant away with the butt of the gun, striking him on the side of the face; that after defendant was some 5 or 6 feet away, he had heard another shot and had observed defendant fall to his knees on the pavement and say "Thanks"; that he had then handcuffed defendant while holding his gun in his left hand, fastening the handcuffs on defendant with his right hand; that he had grabbed defendant's side pockets to see if there was a gun in them but did not find any; that he had asked defendant what he had done with the gun and defendant had replied that he "threw it away." He testified that certain pictures submitted in evidence which showed defendant kneeling with his head on the pavement while being covered by the witness

with a drawn pistol were not taken until after an ambulance had arrived and after defendant had made the statements described; that no threats or promises of any kind had been made to defendant at any time. The testimony of Officers Olson and Becker was corroborated by other police officers who were present.

Paul Martin Tholl, a patrolman for the St. Cloud Police Department, testified that he was present on the occasion of defendant's arrest; that when he first observed defendant's automobile coming from the southeast on Highway No. 152 it was traveling in excess of 50 miles per hour; that it did not stop for the signs at the intersection of Highways Nos. 15 and 152; that at the time he was operating a patrol car and gave chase to the 1959 Pontiac which defendant was driving; that shortly after the collision between defendant's car and the Oldsmobile, he arrived at the scene of the accident; that at that time defendant was trying to get out of his car; that as defendant got out of his car he put his hand in his right jacket pocket and looked at Officers Koetter and Schwankel and at the witness; that defendant then looked at Officer Becker and rushed Officer Becker; that Tholl did not hear either Officer Becker or the defendant make any statement at that time; that he did not hear any remarks made by the defendant; that Tholl had his gun out at the time and had aimed it at defendant as he rushed toward Becker; that he had fired the gun but had hit upon an empty cylinder and by the time that he had the hammer pulled back again, defendant was already on Becker; that when defendant was about halfway toward Becker, Becker fired a shot; that after Becker had discharged his gun, defendant kept running toward him and did not slow down; that Becker then hit defendant with the butt of his shotgun and knocked him away; that Tholl then heard the second blast of a weapon and observed defendant fall to the pavement where the witness and Officers Schwankel and Becker rushed around him and subdued him; that he heard Officer Olson talk to the defendant and ask him where he had thrown the gun he had used, but had heard no response from defendant; and that as they continued to guard defendant, he had said, "Shoot me. I want to die," and other words to that effect.

Eldon Hardy, sheriff of Meeker County, in his testimony identified photographs of defendant's automobile with license number 4U-8140 attached and disclosed where it had been stored pending trial. He also identified the clothing which had been taken from defendant, including exhibit C, and disclosed where it had been stored pending trial. He testified that at the time defendant's car was taken from him there was blood on its front seat.

Jay Cochran, Jr., special agent of the Federal Bureau of Investigation, qualified as an expert on firearms, called by the state, testified that he had compared the bullet removed from Officer Van Ort with the one removed from Officer Eades; that in his opinion they were fired from the same weapon; that they were .22-caliber projectiles, commonly known as .22-caliber short or long; and he thought they were probably fired from a revolver because of the difference in the length of the bearing surface of the weapon and the fact that a revolver bullet "has to jump a small gap before it takes the rifling."

Stanton O. Berg, called by defendant, qualified as a firearms expert, testified that in his opinion the bullet removed from Officer Van Ort and the bullet removed from Officer Eades were both .22-caliber bullets; that each appeared to have been fired from a revolver; and that since they had similar characteristics or markings and basing his opinion upon the microscopic photographic reproductions of them made by the Federal Bureau of Investigation and submitted in evidence, he thought they were both fired from the same gun.

Defendant testified on his own behalf. In his testimony he admitted ownership of the Pontiac. He disclosed that he lived in St. Paul, where he was secretary-treasurer of a bottle club for colored people known as the Turtle Club. He testified that he had no recollection of being in Willmar or Eden Valley at the time of the shootings described; that on the evening of September 22, 1962, he had left St. Paul after 10 p. m. on a trip to Minot, North Dakota, to meet a man by the name of Joe Johnson to discuss with him a plan for a private club; and that he also planned to do some fishing on the way if the occasion arose. He denied owning a .22-caliber weapon. He was asked if he had any recollection of passing through the intersection of High-

ways Nos. 52 and 15, or turning west onto Highway No. 52 on the morning of September 23, 1962, and he replied that he had none. He denied that he had shot the police officers as described by the state's witnesses. He was asked if he recalled anything of the events in St. Cloud and answered, "All I have is impressions"; "I know I was in an accident, and that's it." He was asked whether he owned the jacket taken from him at that time and he answered that he did not know whether it was his. He could not identify Joe Johnson or tell where he could be found or where he had met him before. In support of defendant's testimony, Landon Brant Swyningan, Jr., of St. Paul testified that he had seen defendant at the Turtle Club at about 10 p. m. September 22, 1962, and had borrowed money from him at that time.

## PROCEDURAL QUESTIONS

On April 8, 1963, just prior to commencement of trial, defendant moved for a change of venue on the ground that extensive radio, television, and newspaper releases with reference to the crime in both metropolitan and local news facilities were such that defendant, because he was a Negro, could not obtain a fair trial in the District Court of Meeker County. Copies of some of the news items referred to were attached to the notice of motion. Therein photographs of the defendant identified him as the offender in all three of the incidents described. The motion was denied. As indicated above, the crime for which defendant was tried was committed on September 23, 1962, and his trial did not commence until April 15, 1963. There is no showing that any prejudicial news items were released on or about the time of such trial.

Just prior to commencement of trial, Sheriff Hardy of Meeker County was present in the court's chambers where defendant had made a motion to sequester witnesses. Defendant's counsel objected to his presence there and the court directed him to leave, pointing out however that he had been present on other matters at the request of the court. Subsequently, he was present during the trial and testified on behalf of the state as above set forth. As the jury was about to leave the courtroom after final summation of the case, one of the jurors spoke to him,

and defendant promptly moved for a mistrial. Thereupon, the court called the sheriff in chambers to testify as to what had occurred. The sheriff then testified that one of the jurors had asked him whether she could speak to her daughter who was in the courtroom and that he had denied her request and had told her to go to the jury room; that thereafter he had asked the bailiff to ascertain what she wanted and the bailiff had returned from the jury room with three car keys with instructions that they be given to this juror's daughter, who was then in the courtroom, and that he had done so; that this was the full extent of any conversation he had had with any of the jurors. The court thereupon denied the motion for a mistrial.

---

At the commencement of trial, defendant moved for the sequestration of all witnesses on the ground that a question of identity was involved. The court denied this, stating that there were no accommodations for such procedure. The following proceedings then occurred:

"MR. COCHRANE: The Court has said that there are not accommodations. It would appear to Counsel that there are seats in the corridors of this court house and that there is a Commissioners' room available * * *.

"MR. FEIKEMA: The State opposes the motion and asserts to the Court that there is no evidence that * * * there are discrepancies in the testimony except what may be contained in the preliminary hearing; and if that be the case, Counsel is more than adequately protected by the transcript in the preliminary hearing * * *.

\*     \*     \*     \*     \*

"THE COURT: * * * I don't know whether the Commissioners' room will be available or not. It's a separate and distinct office here in the court house, adjacent to the County Auditor's office. I don't know how long this trial is going to last. The only other available room would be the jury room which is being used by the jurors * * *."

The motion was denied. The same motion was made on two later occasions during the trial, and each time it was denied.

---

Before testimony of the arresting officers was received with respect to defendant's statement at the time of his arrest that he had thrown away the gun, defendant's counsel objected to such testimony on the grounds that defendant's statement was not voluntary but was made under threats by the arresting officers. Outside of the presence of the jury, the court then took the testimony of the two officers and of defendant with respect to this accident. Police Officers Olson and Becker then testified in substance as they later testified before the jury as above outlined. Defendant then testified as follows:

(Not in the presence of the jury)
"BY MR. COCHRANE:

"Q. Did anybody say to you [at the time of arrest], 'You black bastard, we're going to blow your head off', or words to that effect?

"A. Yes.

"Q. Who said that to you?

"A. Olson did.

\*   \*   \*   \*   \*

"A. When he said that, one of the policemen had his foot on my neck, and I was trying to get up again, and Mr. Olson was standing very close to me. I don't know how far it was in feet, but where I would have to look up to him in order to see who he was. \* \* \* He told me that I was going to die, and I had been shot I don't know how many times then. \* \* \* And I told him at that time, 'Well go ahead and kill me then.' \* \* \*

\*   \*   \*   \*   \*

"A. \* \* \* He [Olson] said, 'Kill the black son of a bitch.' He told Becker to do it, and Becker wouldn't shoot again, and Olson shot himself."

The court then determined that the jury should decide whether the statement attributed to defendant at the time of his arrest was voluntary. Thereupon, over continued objection of defendant's counsel, Officers Olson and Becker repeated the testimony which they had given before the court in chambers and which has been set forth above. Defendant

took the stand in his own defense but did not repeat the testimony he had given before the court in chambers. He then testified as follows:

(In the presence of the jury)
"BY MR. COCHRANE:

\* \* \* \* \*

"Q. Do you have any independent recollection of the events that transpired in St. Cloud, that you heard testified to here?

"A. No. I know I was in an accident, and that's it.

\* \* \* \* \*

"BY MR. FEIKEMA:

"Q. It is my understanding, Mr. Ellis, that you have no independent recollection other than the accident that occurred in St. Cloud?

\* \* \* \* \*

"A. That's right."

Mr. Feikema then asked him if he had not testified before the court in chambers that one of the arresting officers had said to him, "You black bastard, we're going to blow your head off" and that at that time "one of the policemen had his foot on my neck, and I was trying to get up \* \* \* and I had been shot, I don't know how many times \* \* \*." Defendant admitted giving such testimony and was then asked:

"Q. I'm asking you whether or not the statement that I just read to you which you gave before Judge Gandrud less than eleven days ago was a statement of fact which you recalled, or what, sir?

"A. Ask the question again so I can understand it.

\* \* \* \* \*

"Q. Is it your testimony on this occasion, right now, sir, that you have no independent recollection of what happened following the accident?

\* \* \* \* \*

"A. I have impressions of things that happened, some things that I am reasonably sure of, others that I am not.

\* \* \* \* \*

"Q. Do you recall anybody shooting at you with a pistol there, sir?

"A. I don't know.

\* \* \* \* \*

"Q. I want to know right now, sir, if you recall where you were when Olson shot you?

"A. I'm not sure.

"Q. Do you recall my asking you a question in chambers on the same occasion of April 15, 1963, \* \* \* 'Is it your testimony that you were shot by Mr. Olson while you were lying on the ground?' And your answer, 'Yes, he shot me while I was on the ground.' Did you give that answer to that question, sir?

"A. I don't remember.

\* \* \* \* \*

"Q. How many times were you shot in St. Cloud?

"A. I don't recall. I don't really know.

\* \* \* \* \*

"Q. Yet today, you don't recall anything that occurred following your accident in St. Cloud, is that right, sir?

"A. That isn't quite what I meant.

"Q. Do you recall the same events today that you recalled on April 15th?

"A. Some more, some less."

In its instructions with respect to this testimony, the court stated:

"The State claims that certain statements or admissions were made to Officers Olson and Becker at the scene of the accident and shooting in St. Cloud, particularly dealing with what happened to a firearm. The Court instructs you that such statements or utterances are only to be considered by you as a part of the evidence in this case if you find that such utterances were voluntarily made, and that at said time the defendant was capable of recollecting and narrating the facts to which his utterances or statements relate. If the lack of such ability appears, then they should not be considered by you. If however, you find that such statements were made, or either of them were made, and

you further find that they were voluntary and that the defendant at the time of making the same, was capable of recollecting and narrating such facts, then they may be considered by you and given such weight as you feel that they are entitled to.

"In weighing the evidence relative to the purported statements, you will consider the circumstances under which they were made as disclosed by the evidence, including the defendant's age, experience and mentality, and you will determine from all of the evidence in the case and the law given you by the Court whether they were voluntary."

---

Both parties rested at 11:35 a. m. on Friday, April 26, 1963. Defendant's counsel then moved that the case be continued until the following Monday to give him additional time to prepare his final argument. He stated to the court that the trial had consumed 11 days and had involved over 150 exhibits and that because during the trial his extra time had been taken up in locating witnesses, searching for exhibits, examining evidence, and like matters, he had not had time to prepare his final argument. Counsel for the state objected to any continuance, pointing out that defendant's counsel had been retained September 26, 1962; that the major portion of the state's case had been submitted on October 31, 1962, at the preliminary hearing; that a transcript of the testimony at such preliminary hearing had been delivered to defendant's counsel shortly after such hearing; and that throughout the trial he had had the assistance of two able and competent attorneys.

The court did not grant the motion for continuance but adjourned the case until 1:30 that afternoon. Motions by defendant were then submitted and arguments thereon consumed about 1 hour and 10 minutes. At 2:40 p. m. counsel for the state commenced his final argument. The record does not disclose the time required for this. Following a 15-minute recess thereafter, defendant's counsel commenced his closing argument, completing it later the same afternoon. The case was submitted to the jury at 5 p. m. and at 10:50 p. m. the same date it returned its verdict of "guilty."

It is defendant's contention that the court's denial of his counsel's

request for additional time in which to prepare his closing argument constituted a denial of due process.

---

Defendant contends that certain statements made by counsel for the state in his final argument, as hereinafter italicized, were so prejudicial and improper as to require a new trial, to wit:

"The State, in any criminal case, as the Court will instruct you, has a *terrific burden.* The burden on the State is that the State must prove each and every element of the crime to you, beyond a reasonable doubt. * * *

\* \* \* \* \*

"\* \* \* why did he come out shooting at Ed Eades? Because of the Willmar incident. Why did he intend, what was his intent? *His intent was to kill Ed Eades and get away.* That we have shown because of what happened at Willmar. * * *

\* \* \* \* \*

"\* \* \* Now the Court will instruct you with regard to the statements made by Officer Becker, by Officer Olson and by the defendant, Rudolph Ellis in this case, with regard to the time he was brought down by Officer Olson. Olson went over and made a statement to him, if I remember correctly, 'Where is the gun?' He said, 'I threw it away.' Officer Becker said, 'What did you do with the gun?' He said, 'I threw it away.' And it will be up to you as jurors to determine whether or not that was voluntary or not. And I submit to you that *there wasn't time for this defendant to fabricate a story,* and it conforms to all the other facts in this particular case. * * *

\* \* \* \* \*

"\* \* \* Remember this, all the State of Minnesota asks of you is that we get equal justice under law, equal justice under law. * * * It doesn't matter the color of our skin, accident of birth. I might have been born black, yellow, red or white. It doesn't matter. We want equal justice for every man in this court, and I'm sure that each one of you is going to see that Justice prevails in this case and that you're not going to convict an innocent man, nor are you going to acquit a guilty man. The

courts are great levelers. Everyone is treated equally. I know you have heard the evidence and *you're going to weigh the evidence without fear of intimidation against you or your children, or your loved ones.* You're going to decide this case without favor, without favor for the State of Minnesota.

"MR. COCHRANE: Just a minute. * * * I know nothing of any intimidation, and I move that the jury be instructed that that is improper argument.

   *  *  *  *  *

"COUNTY ATTORNEY: I said without fear and intimidation they're going to decide this case.

"THE COURT: Continue, Counsel.

"COUNTY ATTORNEY: And I know you're going to decide this case without favor for the State of Minnesota or for the defendant in this case. You're going to weigh the evidence impartially and decide this case under the instructions of the Court and in accordance with the oath that you have given to all of us. * * *

   *  *  *  *  *

"Now after you weigh the evidence and decide it fairly and impartially, and follow the instructions of the Court, you will see from the evidence that there will have to be a verdict of guilty beyond a reasonable doubt. Not beyond any doubt, but beyond a reasonable doubt * * *. *And a verdict of guilty in this particular case, and under the evidence as I remember it, will do several things. One thing, it will protect our citizens. Number two, you owe a duty to every citizen in the State of Minnesota, whether it be a baby in a crib at International Falls, or senior citizens hobbling down the street of Winona, that we owe the same duty to each one, that we get equal protection under the law and to see that the law is enforced, and that the guilty are brought to the bar of justice,* and obtain justice. We want to preserve law and order in our society. Without that, we cannot exist as free men." (Italics supplied.)

▇ The evidence outlined is more than adequate to support the jury's finding that defendant was guilty of the crime with which he was

charged. Any discussion of it in further detail would serve no useful purpose.

■ We find no prejudicial error in the denial of defendant's motion for mistrial, which motion was based upon the conduct of Sheriff Hardy in being present in the court's chambers prior to commencement of trial; or upon his conduct just before the jury retired when one of the jurors requested his permission to speak to her daughter in the courtroom so that the juror might deliver to her daughter automobile keys to the juror's car. There was nothing whatever in the conduct of the sheriff on either of the occasions that could possibly have prejudiced defendant in his trial.

■ We hold that no prejudicial error was committed in denying defendant's motion for change of venue. In support of this motion, copies of various news articles clipped from newspaper publications at Willmar, Litchfield, and other municipalities in proximity to the place of trial were submitted. These included photographs of defendant as he appeared on the occasion of his arrest and referred to him as having committed the crime for which he was later tried. Defendant's arrest took place on September 23, 1962, and the news items and photographs referred to were published between September 24, 1962, and September 27, 1962. Defendant's motion for change of venue was made April 8, 1963, and his trial did not commence until April 15, 1963, almost 7 months after publication of the articles and photographs described. We do not feel that it has been shown by this that at the time of trial there was such prejudice against defendant because of these publications that he could not obtain an impartial jury in a county of 18,887 inhabitants.[2] Minn. St. 627.01 provides that unless it shall appear to the satisfaction of the court by affidavit that a fair and impartial trial cannot be had in the county where the crime was committed, each criminal cause shall be tried in the county where the offense was committed. In State v. Dehler, 262 Minn. 171, 115 N. W. (2d) 358, this court again stated the well-established rule that determination of such matters rests in the sound discretion of the trial court and that where there is no showing of an abuse of such discretion its

[2]United States Census, 1960.

judgment with respect to venue will be affirmed. In Wolfe v. Nash (8 Cir.) 313 F. (2d) 393, 397, where a similar claim was made, the court stated:

"* * * The offense was committed * * * October 18 * * * and the trial was held * * * more than 4 months later. It seems improbable that public attention of residents of Pike County could have remained focussed on Wolfe and his alleged misdoings during that entire period." Citing Darcy v. Handy, 351 U. S. 454, 76 S. Ct. 965, 100 L. ed. 1331.

The instant case is not comparable with Irvin v. Dowd, 366 U. S. 717, 728, 81 S. Ct. 1639, 1645, 6 L. ed. (2d) 751, 759, where "two thirds of the jurors had an opinion that petitioner was guilty and were familiar with the material facts and circumstances involved." Here the record fails to disclose that any of the jurors impaneled to determine the question of defendant's guilt or innocence were familiar with the news articles in question or were so prejudiced thereby that they could not render a fair verdict in the case.

■ Just prior to commencement of the trial and twice during the trial defendant moved for sequestration of all witnesses, and he asserts that the court's denial of this motion on the ground that there were no convenient quarters available in the courthouse for such sequestration constituted prejudicial error entitling him to a new trial. The basic reason for sequestration of witnesses, of course, is to remove any possibility that a witness waiting to testify may be influenced consciously or subconsciously by the testimony of other witnesses testifying in his presence and to afford opposing counsel the opportunity of bringing out in cross-examination any discrepancies in the testimony of the various witnesses. However, in the instant case it appears that a number of the state's principal witnesses had previously testified in detail at the preliminary hearing, and that defendant's counsel had been provided with a complete transcript of such testimony long before the trial. Unquestionably, any inconsistencies or variations in their testimony at the preliminary hearing would be apparent to defendant's counsel prior to trial. Likewise, had there been any design on the part of these witnesses to harmonize their testimony before trial, a reference to such transcript would have afforded the opportunity of so doing. Their testimony at

the trial discloses no substantial variation from or inconsistency with their previous testimony. In State v. Garden, 267 Minn. 97, 125 N. W. (2d) 591, we discussed sequestration of witnesses and adhered to the view that where fact issues are vital, sequestration should be granted as a matter of course, pointing out, however, that the question generally rested in the court's discretion. However, for the reasons outlined above, we conclude that here in denying the motion for sequestration the court did not abuse its discretion to the extent of prejudicial error.

■ An important question presented has reference to the admissibility of the testimony of the arresting officers that at the time of his arrest defendant in response to their demands had stated that he had thrown away the gun with which the other officers had been shot. It is defendant's contention that because the testimony of the arresting officers showed that any statements of defendant were made after he had been shot and was unable to react normally, and while weapons of the arresting officers were leveled at him, the testimony with respect to such statements was inadmissible. The court treated the statement in question as in the nature of a confession, and after hearing evidence in chambers as to the circumstances under which it was made submitted the issue of its voluntariness to the jury with instructions as above set forth. This was pursuant to State v. Schabert, 218 Minn. 1, 15 N. W. (2d) 585, where it was held that when this issue arises the court, outside the jury's presence, should hear all evidence on the question, and where this discloses doubt as to the voluntariness of the confession, submit such evidence, together with the confession, to the jury for determination of the issue of voluntariness.[3]

---

[3] In Jackson v. Denno, 378 U. S. 368, 84 S. Ct. 1774, 12 L. ed. (2d) 908, it was held that procedure of this kind, which had been approved in Stein v. New York, 346 U. S. 156, 73 S. Ct. 1077, 97 L. ed. 1522, was erroneous because it placed before the jury, with possibly impelling effect, a confession which the jury might determine was involuntary and hence inadmissible. From Jackson it would follow that if the statement made by defendant here at the time of his arrest was in effect a confession, then the case would have to be remanded so the court, rather than the jury, might determine the issue of voluntariness—a new trial to follow only if the court found that defendant's statement was not voluntary.

However, it is our view that the testimony of the arresting officers with respect to defendant's statement was admissible as part of the res gestae in his arrest, and accordingly the principles set forth in Jackson v. Denno, 378 U. S. 368, 84 S. Ct. 1774, 12 L. ed. (2d) 908, with respect to confessions have no application. (See footnote 3, *supra.*)

It is generally recognized that testimony as to spontaneous or excited utterances which form part of a startling event is admissible when the utterances characterize the event and the circumstances under which they are made negative the probability of their fabrication. Fenton v. Minneapolis St. Ry. Co. 252 Minn. 75, 89 N. W. (2d) 404; State v. Jue Ming, 180 Minn. 221, 230 N. W. 639; State v. Humphrey, 173 Minn. 410, 217 N. W. 373; State v. Hunter, 131 Minn. 252, 154 N. W. 1083, L. R. A. 1916C, 566; State v. Williams, 96 Minn. 351, 105 N. W. 265; State v. Horan, 32 Minn. 394, 20 N. W. 905; State v. Sucik, 217 Minn. 556, 14 N. W. (2d) 857; State v. Burtts (S. D.) 132 N. W. (2d) 209; Wright v. State (Tex. Cr. App.) 388 S. W. (2d) 194; Westcoat v. Maryland, 231 Md. 364, 190 A. (2d) 544; McCormick, Evidence, § 272; Donigan and Fisher, The Evidence Handbook (1965), The Traffic Institute, Northwestern University. This is true, notwithstanding that the utterances are prompted by demands for information directed to the declarant. State v. Gorman, 229 Minn. 524, 40 N. W. (2d) 347; People v. Costa, 40 Cal. (2d) 160, 252 P. (2d) 1; Commonwealth v. Noble, 371 Pa. 138, 88 A. (2d) 760; see, McCormick, Evidence, § 274, p. 587; Donigan and Fisher, The Evidence Handbook (1965), The Traffic Institute, Northwestern University.

The search for truth—the primary function of the judiciary—no doubt forms the basis for the admission of testimony with respect to utterances of this kind which are deemed especially reliable.[4] See,

---

[4]The judicial quest for truth likewise forms the basis for the admission of confessions made under constitutional and statutory safeguards which negative factors of coercion, subterfuge, or other unlawful processes in their inducement, and which are indicative of their voluntary nature and hence their reliability. See, McCormick, Evidence, § 109. However, under

Ammundson v. Falk, 228 Minn. 115, 36 N. W. (2d) 521, 7 A. L. R. (2d) 1318; McCormick, Evidence, § 274, p. 587.

Here it is obvious that upon the violent arrest of defendant he completely lacked the opportunity or time to fabricate a response to the arresting officers' demand for his weapon, and his statement that he had thrown it away was a spontaneous and instinctive reaction to this demand. The procedure in apprehending him was lawful in every respect and his statement was not the result of any attempt to obtain a confession from him, but rather of the officers' design to avoid being shot by him. At this stage of the proceedings, no duty rested upon them to advise him as to his constitutional rights or to follow processes required to validate a confession as such.

Based upon such considerations, we hold that the trial court did not abuse its discretion in receiving the testimony described and that it was unnecessary to first determine whether it was a voluntary confession or otherwise before receiving it. Of course, the fact that the court followed this procedure was not prejudicial to defendant, since it afforded him an additional safeguard in his defense.

■ The request of defendant's counsel for additional time in which to prepare his final argument was denied. We feel that this matter was one resting in the sound discretion of the court and that in denying this request there was no abuse of discretion. The transcript of the evidence clearly establishes that defendant's counsel gave him skillful and competent service in connection with his lengthy trial. Most of the testimony submitted on behalf of the state had been submitted previously at the preliminary hearing and defendant's counsel had been provided with a transcript of it long before trial. The trial was a lengthy one and it was incumbent upon defendant's counsel to procure evi-

---

recent United States Supreme Court decisions, the search-for-truth function of the courts cannot be made the basis for the admission of even truthful confessions which were induced by unlawful processes, Jackson v. Denno, *supra*; Rogers v. Richmond, 365 U. S. 534, 81 S. Ct. 735, 5 L. ed. (2d) 760; Blackburn v. Alabama, 361 U. S. 199, 80 S. Ct. 274, 4 L. ed. (2d) 242; notwithstanding the conclusions to the contrary in 3 Wigmore, Evidence (3 ed.) § 823(b). See, Kamisar, *What is an "Involuntary" Confession?* 17 Rutgers L. Rev. 728.

dence, check exhibits, interview witnesses, and perform like services during its progress, but it must be noted that he had the assistance of two competent lawyers in the performance of such tasks. Under these circumstances, we cannot say that the time allotted for preparation of his final argument was so limited or restricted that the court's refusal to grant him additional time constituted a denial of due process to defendant.

■ Defendant's final contention is that counsel for the state in his closing argument made statements with respect to the evidence and to other matters which were so prejudicial and unfounded as to constitute error. These statements have been set forth in detail above. We have examined them carefully and find nothing in them to support this contention. All appear to relate to the evidence or the inferences to be drawn therefrom. All were within the proper concepts of the obligations resting upon counsel for the state in the prosecution of criminal offenses. As noted therein, the state did have a "terrific burden" in proving the guilt of defendant and undertook to sustain it by presenting in detail a mass of material evidence with respect to the crime. The statement that at the time of his arrest "there wasn't time for this defendant to fabricate a story" seems amply supported by the evidence and constituted a valid inference to be drawn from it. Likewise, as stated, the jury was required to determine the case upon the evidence presented "without fear of intimidation" and, likewise, as stated, each citizen is "entitled to equal protection under the law without regard to racial or other classifications or distinctions." Such statements were nothing more than the enunciation of well-established legal and constitutional principles. We find no error therein. See, 14 Dunnell, Dig. (3 ed.) § 7102, and cases cited.

Affirmed.