## STATE v. DAVID AUGUST DHAEMERS.

150 N. W. (2d) 61.

April 14, 1967—No. 40,029.

ed. (2d) 1503; Aguilar v. Texas, 378 U. S. 108, 84 S. Ct. 1509, 12 L. ed. (2d) 723; Barnes v. Texas, 380 U. S. 253, 85 S. Ct. 942, 13 L. ed. (2d) 818.

*Whitney E. Tarutis,* for appellant.

*Douglas M. Head,* Attorney General, *George M. Scott,* County Attorney, and *Harlan M. Goulett,* Assistant County Attorney, for respondent.

KNUTSON, CHIEF JUSTICE.

Defendant was indicted by the grand jury on two counts of murder in the first degree and on February 1, 1965, was convicted of the commission of the crimes. He appeals from his convictions.

It is not necessary to state the facts in great detail inasmuch as it is evident from the record that a jury could find that on December 21, 1961, defendant induced a friend by the name of Peterson to drive him to the home of his parents-in-law where his wife, Penny, with whom he was not then living, was staying; procured a gun from the trunk of his car; entered the home; and shot and killed both his wife and his mother-in-law. Prior to the time of the killing he had been served by Deputy Sheriff William Broms with papers demanding temporary alimony and including a restraining order, all of which were involved in a divorce proceeding commenced by his wife.

The appeal deals mainly with the procedure that was followed as defendant was brought into court. On January 10, 1962, he appeared for arraignment represented by counsel of his own choosing. Upon motion of his counsel he was referred to the University of Minnesota Hospitals for a mental examination to determine whether he was mentally competent to stand trial. For some reason not shown by the record they were unwilling to undertake the examination, so he was referred to Mr. Milford B. Lytle, Chief Psychologist, and Dr. James T. Garvey, Psychiatrist, attached to the Hennepin County Department of Court Services. In his report to the court, Mr. Lytle found that the defendant "does not seem able to participate in his own defense," and as to whether he knew right from wrong in the nature and quality of his act at the time of the crime, that "cannot definitively be answered at this time." Dr. Garvey advised the court that defendant "is not in mental capacity to help in his own defense. * * * Thus, the conclusion would be that this man is not mentally competent to stand trial" and "there is complete blocking as far as his memory is concerned, and I do not see how we can possibly ascertain at this time what his status was at the time of the commitment of the act." In order to be doubly sure, the trial court referred defendant to the Court Commissioner of Hennepin County, who normally conducts hearings for commitment to mental hospitals, to conduct an examination and hearing and report to the court concerning defendant's mental condition. The court commissioner and the other members of the Board of Examiners in a report dated January 23, 1962, concurred with the opinions of Mr. Lytle and Dr. Garvey that defendant was incompetent to stand trial and, in addition, rendered the opinion that he was insane at the time of the commission of the alleged offenses. As a result of these reports the court committed defendant to the Minnesota Security Hospital at St. Peter, Minnesota, by its order dated January 24, 1962.

Thereafter, the superintendent of the Minnesota Security Hospital stated that the defendant was now competent to understand the nature of the proceedings and to assist in his own defense. By its order dated September 11, 1962, defendant was returned to the district court for

trial. He appeared on September 13, and pleas of not guilty to both indictments were entered for him.

On October 19, 1962, defense counsel moved the court that a further examination of defendant be made for the purpose of determining his competency to stand trial. He was again referred to Mr. Lytle and Dr. George Dorsey, Consulting Psychiatrist of the Department of Court Services. On October 25, 1962, Mr. Lytle reported to the court that defendant "is more integrated at this time than he was when seen in January. However, he does not seem competent to participate effectively in his own defense." Dr. Dorsey, who had not theretofore seen defendant, reported that "under the circumstances it did seem that he [defendant] would not be able to participate adequately in his own defense at this time." The trial court thereupon, on November 2, 1962, recommitted defendant to the Minnesota Security Hospital "until he shall have recovered sufficiently to be capable of understanding the criminal proceedings against him and in cooperating in his own defense."

In September 1964 the acting medical director of the Minnesota Security Hospital advised the court that in his opinion defendant was once again competent to stand trial. He was returned to the trial court pursuant to an order dated October 28, 1964, and appeared on November 6 with his counsel and on motion of his counsel was again referred to the Department of Court Services for examination as to his competency to stand trial. Dr. Dorsey then agreed with the acting medical director of the security hospital that defendant "was able to understand the criminal proceedings against him and is capable of cooperating in his defense." He again appeared on December 9, 1964, with his counsel, who requested that he be permitted to have defendant examined by Dr. James Schumacher, a psychiatrist of their own choosing, which request was granted. The matter was continued until January 11, 1965, to allow Dr. Schumacher to make such examination. On January 11, defense counsel announced to the court:

"In addition to the study which has been made by the Department of Court Services we have had a private psychiatrist on it.

"We have no quarrel now with the proposition that this matter do proceed to trial. And we have been advised privately that * * * he is able to cooperate in his defense."

The defendant waived a jury and the case thereupon went to trial before the Honorable Irving R. Brand who, after trial, found the defendant guilty of murder in the first degree on both indictments.

■ Defendant now contends that, inasmuch as the court commissioner and the medical examiners, in addition to finding that defendant was mentally incompetent to stand trial, found that he was insane at the time of the commission of the alleged offenses, that finding is res judicata and the court had no jurisdiction to try the defendant but was compelled to find him not guilty on the ground of insanity at the time of the commission of the offense.

The contentions of defendant involve two statutes—Minn. St. 631.18, which deals with an examination of a defendant charged with a crime for the purpose of determining whether he is competent to stand trial, and § 631.19, which deals with a determination of his guilt or innocence based upon insanity at the time of the commission of the offense. Obviously, counsel for defendant on appeal has confused the purpose of these two statutes. Section 631.18, so far as material, reads:

"When any person under indictment or information, and before or during the trial thereon and before verdict is rendered, shall be found to be insane, * * * the court * * * shall forthwith commit him to the proper state hospital * * * until he shall recover, when he shall be returned to the court * * * to be placed on trial * * *."

Section 631.19, so far as material, reads:

"When, during the trial of any person on an indictment or information, such person shall be found to have been, at the date of the offense alleged in the indictment, insane * * * and is acquitted on that ground, the jury or the court, as the case may be, shall so state in the verdict, or upon the minutes, and the court shall thereupon, forthwith, commit such person to the proper state hospital or asylum for safekeeping and treatment * * *.

"The person so acquitted shall be liberated from such hospital or asylum upon the order of the court committing him thereto, when there is presented to the court the certificate, in writing, of the superintendent of the hospital or asylum where such person is confined, certifying that in the opinion of such superintendent such person is wholly recovered and that no person will be endangered by his discharge."

While these two statutes do not state in detail the procedure to be followed in making a determination of the mental capacity of a defendant, it is obvious that they do cover two stages of the proceeding; and the result of a recovery is entirely different, depending on which statute he is committed under. The court commissioner and the medical examiners could not try the defendant for the crime of murder. Neither could their finding that defendant was insane at the time of the commission of the offense have any binding effect upon the court or jury when defendant was ultimately tried. That was a matter for the court's determination based on the evidence at the time of trial, not on a preliminary hearing prior to trial. As a matter of fact, defendant had entered no plea at the time the commissioner and the examiners made this finding. The finding that defendant was insane at the time of the commission of the offense was not necessary and at best was mere surplusage. All the commissioner and examiners were required to do at that stage of the proceeding was to determine the mental competency of defendant to stand trial and to cooperate in his own defense. The question of his sanity or insanity at the time of the commission of the offense was not in issue and should not have been determined at that point. Certainly it was not res judicata so as to bind the court or the jury when defendant was ultimately brought to trial.

■ Defendant next contends that, inasmuch as the medical examiners had found him insane at the time of the commission of the offense and subsequent thereto, he did not have mental competency to waive a jury. There is no merit to this contention. Defendant was represented by counsel who was satisfied at the time he was brought to trial that he was competent to assist in his own defense, and the prior determinations of incompetency did not affect his ability to determine whether he wanted a jury trial or not.

■ Defendant also contends that there was an unlawful search and seizure with respect to the admission of the gun with which he committed the crimes.

After the commission of the crimes, defendant was apprehended at the home of his mother. Thereupon one of the arresting officers asked defendant where the weapon was, to which defendant answered, "It is in the car." The officer asked permission from defendant's mother to search the car, which she readily gave him. The car belonged to defendant's mother. Thereupon the gun was found and taken into possession. At the time it was offered in evidence, there was no objection by defendant's counsel. We fail to see how there was any unlawful search and seizure in such procedure.

■ Defendant also contends that his constitutional rights against self-incrimination were violated by the officer's question, "Where is the weapon?" and his answer, "It is in the car." When defendant was apprehended as a result of a request by his mother that a policeman accompany her to her home, defendant had procured a shotgun and was threatening to shoot himself. Certainly the officer had a right to disarm defendant and, in order to prevent further harm, to find out where the gun was with which he had committed the two murders which were then known to the officer. Whether this admission be called part of the res gestae[1] or simply incident to the officer's exercise of his right to protect himself, we cannot agree that it was any violation of defendant's right against self-incrimination. The gun was in the automobile and there is no one who questions the fact that it was this gun, as was shown ballistically, that had been used in the commission of the murders.

■ Defendant also contends that the court erred in applying the test of criminal responsibility set forth in Minn. St. 611.026, the so-called M'Naghten rule, which reads:

"No person shall be tried, sentenced, or punished for any crime while in a state of idiocy, imbecility, lunacy, or insanity, so as to be incapable of understanding the proceedings or making a defense; but

---

[1] See, State v. Ellis, 271 Minn. 345, 136 N. W. (2d) 384.

he shall not be excused from criminal liability except upon proof that at the time of committing the alleged criminal act he was laboring under such a defect of reason, from one of these causes, as not to know the nature of his act, or that it was wrong."

While we agree that the M'Naghten rule should have been discarded with the horse and buggy,[2] it is part of our statutory law and as such, as long as we adhere to the rule that the legislature can prescribe rules of evidence, we must adhere to the statute. State v. Finn, 257 Minn. 138, 100 N. W. (2d) 508.[3] It would be better if the statute were repealed so that the courts could develop rules for determining mental competency more in harmony with advances made in this scientific field since the announcement of the M'Naghten rule in 1843.

■ Aside from the above assignments of error, we see no necessity of further discussing the issues raised. In the determination of the mental competency of defendant at the time of the commission of the offense, six doctors testified. The testimony of those who were of the opinion that defendant was sane at the time of the commission of the crime amply sustains the findings of the court in that respect. Essentially, that was the only issue open to question. Defendant's actions prior to and after the commission of the crime establish that he knew full well what he was doing. A more detailed recitation of the record of this case would serve no useful purpose, and it is sufficient to state that we are convinced that the evidence sustains the court's finding.

Affirmed.

---

[2] For a comprehensive discussion of the rule and its deficiencies, see United States v. Freeman (2 Cir.) 357 F. (2d) 606, where it was abandoned by the United States Court of Appeals for the Second Circuit.

[3] See, also, State v. Simenson, 195 Minn. 258, 262 N. W. 638.