## STATE v. GERALD P. COLLINS.*

150 N. W. (2d) 850.

May 12, 1967—Nos. 39,691, 40,385.

---

* Certified to U. S. Supreme Court August 25, 1967.

*James S. Simonson,* for appellant.

*Douglas M. Head,* Attorney General, *George M. Scott,* County Attorney, and *Henry M. McCarr, Jr.,* Assistant County Attorney, for respondent.

*Peter Dorsey,* for American Civil Liberties Union, amicus curiae.

NELSON, JUSTICE.

Defendant appeals from orders of the District Court of Hennepin County, one denying his motion for judgment of dismissal or for a new trial, and the other denying his motion for vacation of the judgment or a new trial. He was convicted of aggravated robbery.

Frank and Joseph Wrzos, brothers, owned and operated a tavern

known as Erick's Bar at 300 16th Avenue South, Minneapolis. At approximately 1:30 p. m. Sunday, December 8, 1963, a robbery was committed at their bar while Frank Wrzos was on duty. There were present two waitresses, Eleanor Grimms and Florence Munnell. There were also an undetermined number of customers, variously estimated at 12 to 25, present. The state produced six eyewitnesses to the robbery, namely, Frank Wrzos, Eleanor Grimms, and patrons Orville Block, Hans Markuson, Frank Robert King, and Carl Faber. The record shows that the second waitress, Mrs. Munnell, was in the hospital recuperating from major surgery at the time of the trial. It appears that some of the patrons left the tavern before the police arrived.

The essential elements of the robbery are undisputed. Two armed men entered through the front door, the smaller of the two men, David Scavo, proceeding immediately to keep the bar's customers covered at gunpoint, while the larger and taller man, gun in hand, asked Mrs. Grimms where Frank was and then marched him into the bar's office and forced him to place the contents of a cash drawer and the cash in the safe in a brown paper bag. Wrzos was then returned to the bar where he was made to part with the contents of three cash registers. Approximately $2,700 was taken by the pair. The taller gunman was wearing striped coveralls and a ski cap pulled down to cover his ears and his head down to the eyebrows. After obtaining their loot, the two gunmen herded the bar owner, waitresses, and customers into the bar's basement. Shortly thereafter Frank returned to the bar and discovered that the two gunmen had fled. He immediately called the police.

Mrs. Grimms, the state's first witness, testified that sometime before February 1964 she observed a lineup at the city jail and then identified David Scavo as the smaller of the two gunmen; and that late in February 1964 in a courtroom at the courthouse in Minneapolis she identified the larger of the two gunmen as the defendant. At the trial she unhesitatingly identified him as the larger of the gunmen.

Frank Robert King, a customer present at the time of the robbery, had walked up to the bar just before the robbery took place and could see the taller gunman in the bar office, although the door was closed, since the office resembled a "cashier's cage with bars." King also ob-

served the taller gunman "as he walked along behind the bar in front of [the witness] toward each of the cash registers" and saw him again as he returned to the office in order to get out from behind the bar. At the trial he positively identified defendant as the taller and heavier gunman.

Hans Markuson, another patron in the bar, was so absorbed in watching a football game on television that he failed to realize that something out of the ordinary was happening when the gunmen were only 10 or 12 feet from him. He did not see the owner go into the office, but he did see the cash registers emptied. He said he never had "much of a look" at the gunmen and was unable to identify either of them.

Orville Block, another customer, was sitting at the west end of the bar near the office. He saw the owner lying on the floor in the office, watched the larger gunman walk out of the office with the owner, and saw the cash registers emptied. He readily identified defendant as the taller of the two gunmen and observed at the trial that defendant looked "the same as when he was in the bar." On March 7, 1964, Block had observed a lineup conducted by the Minneapolis Police Department and at that time he identified defendant as one of the gunmen.

Frank Wrzos testified that the two gunmen were a "[big] man and a small man * * *. Heavy-set fellow and a short fellow." He thought that the big man weighed perhaps 200 pounds, was about 6 feet tall, and was "in the neighborhood of maybe 30 years old, something like that or better." Mr. Wrzos could not identify either gunman. He explained that he was "all shook up" and "wasn't looking at the man at all too much because I was all nervous."

Carl Faber, another customer, upon being asked whether he saw either of the two holdup men in the courtroom, replied:

"Well, I see that fellow there, but I still persist that he is—that his facial resemblance is the same, but he looks like a bigger man to me.

"By Mr. Snell [counsel for the state]:

"Q. He looks larger now, heavier?

"A. Much heavier man than I saw that time.

"Q. All right. Otherwise—

"A. The facial resemblance is—his facial resemblance is of the man I saw in Erick's Bar.

"Q. What was your impression at the time of the holdup of the physical size of the person in the coveralls?

"A. Well, I saw that through the mirror, you see.

\* \* \* \* \*

"Q. What height and weight did you feel the person was?

\* \* \* \* \*

"A. I say, about five feet four, but I am not—I am not a good guesser on height."

The state also called Detective Eugene W. Wilson of the Minneapolis Police Department, who had conducted an investigation of the robbery. He testified that on a date, which he could not recall, he arranged to have the witnesses King, Faber, Markuson, and Mrs. Grimms—

"\* \* \* come to the robbery office in the courthouse and \* \* \* I gave them instructions as to not to talk to one another, come to the fourth floor, observe the comings and goings of people and see if any of these people that they saw in the corridors were involved in the holdup."

Detective Wilson also testified that on March 6 or 7, 1964, at the lineup attended by Orville Block, the man wearing the number 4 was defendant. At the lineup Block had identified the man with that number as the larger of the gunmen.

At the close of the state's case, defendant moved for a directed verdict of acquittal. This motion was denied by the trial court. Defendant then called two alibi witnesses in his behalf, one of them David Scavo, a twice-convicted felon who had theretofore pleaded guilty to the same robbery of Erick's Bar. Scavo named one Ronald Holmes rather than defendant as the second gunman. Scavo claimed to have so testified under oath at the entry of his plea. He identified himself as the gunman who had kept the waitresses and customers at bay while his companion obtained the money. However, Scavo admitted to certain difficulties in recalling his association with Holmes and the details of the

robbery in question. His testimony, particularly while under cross-examination by the state, is anything but persuasive. Thus, he testified:

"Q. Where did you first meet Ronald Holmes?

"A. I don't remember that.

"Q. How long ago?

"A. Not very long. A few months, four or five months, six months.

\* \* \* \* \*

"Q. Through whom?

"A. Oh, no one in particular.

"Q. Where did you meet him?

"A. I don't recall. Maybe at Northern Bar.

"Q. Do you know the defendant?

"A. Yes, I do.

\* \* \* \* \*

"Q. Where did you get the guns?

"A. I don't remember.

"Q. Who furnished you with the name of Frank?

"A. I didn't even know the name Frank.

"Q. Who told you that there was a basement?

"A. I didn't even know there was a basement.

"Q. Didn't you and Ronald Holmes plan this in advance?

"A. It was planned in advance, I suppose. I don't know, maybe—it wasn't planned by me in advance.

"Q. You were in on none of the advance planning?

"A. No, no.

"Q. It wasn't decided what you were going to do or what Ronald Holmes was going to do?

"A. Just decided I was going to watch the people, that was all.

"Q. What were you going to do with the people?

"A. No, I didn't know what I was going to do with them.

"Q. How did you know there was a safe in the office?

"A. I didn't. I didn't go back there, I stayed out front. I didn't know if there was a safe or a cash box, or if they kept it in a drawer or in his pocket.

"Q. How many times have you been with Ronald Holmes since you first met him?

"A. Just that one time.

"Q. Just the time of the robbery?

"A. That's right.

"Q. You met him once at the Northern Bar, and then you and he went on a robbery at Ericks's?

"A. Yes.

\* \* \* \* \*

"Q. Have you talked to Mr. Collins since the commission of this crime and the time of your arrest?

"A. Yes."

Scavo asserted that his only conversation with Holmes between the time of the commission of the crime at Erick's Bar and the present was when he "gave him a wave."

Holmes, the second alibi witness called in behalf of defendant, at first refused to answer questions concerning the robbery of Erick's Bar on the ground that the answers might tend to incriminate him. At this point the trial court recessed the trial until the following day and during the recess the county attorney filed a request for immunity from prosecution for Holmes, pursuant to the provisions of Minn. St. 609.09. The trial court granted the request for immunity and thereupon ordered Holmes to answer the questions put to him. He then claimed that he had committed the robbery, professed to recall the details, and testified that it was he who planned the robbery. He described the layout of Erick's Bar and the weapons carried, but admitted that he had been in the bar only once prior to this robbery. He stated that he used a pillow case concealed inside his coveralls as a receptacle for the money taken, although the state's witnesses had said that the larger of the two gunmen had used a brown paper bag in which to deposit and carry the money. Holmes said that he met Scavo for the first time during the week prior to the robbery at the Northern Bar. He claimed that "a couple of guys" had told him about Scavo in response to an inquiry as to whether these unidentified men knew "anybody." Later, he testified, Scavo was pointed out to him at the Northern Bar and he

approached this stranger and said to him, "I heard that you need some money," to which Scavo replied, "Yeah, I need some money. Why?" Holmes then said, "Well, I think I got a good thing." He testified that thereupon he "asked [Scavo] did he want to pull a robbery with me, and he said, 'Yeah.'" Holmes testified that he then proceeded to make arrangements with Scavo for the robbery, telling him:

"* * * Now, all you got to do is cover the people in there. I'll get the money."

Holmes admitted that he had talked to defendant's attorney at the State Prison at Stillwater and had told him in reference to the robbery in question, "I don't know nothing about it." He also admitted that he had talked with Scavo "last month," telling him to "keep his mouth shut," and had seen him "yesterday." On this latter occasion, Holmes claimed he had asked Scavo "What did they beef for?" and he said, "$2700" and Holmes said, "Oh, okay." He explained that the word "beef" meant what loss was claimed by the owners. Holmes claimed that he recalled reading in the newspapers something about a loss of $4,200 in the robbery and that he had also heard the figure $800. He placed the actual amount taken at "pretty close to $2700.00."

On direct examination by defendant's counsel Holmes was asked to take off his glasses. On cross-examination he said that he was not wearing his glasses at the time of the robbery. He was further asked:

"Q.  Do you ever go without your glasses?

"A.  Very seldom.

"Q.  You didn't wear them on that day?

"A.  No, I didn't.

"Q.  Why not?

"A.  Well, they are kind of a give-away.

"Q.  How far can you see without your glasses, how well can you see?

"A.  I can see fairly well. I am not—I have bad eyesight, but I am not blind."

When the defense rested, defendant renewed his motion for a directed

verdict of acquittal and dismissal on the grounds of insufficient evidence. The court again denied the motion.

Following the denial, the state called several rebuttal witnesses, including Patrick McDonald, an employee of the Minneapolis Police Department, who testified that on December 17, 1963, he booked Ronald Holmes in the Minneapolis city jail. Holmes, "[w]ith his clothes on," at that time weighed 168 pounds and stood 5 feet 9 inches. Holmes had testified that in December of 1963, he weighed 198 pounds.

At the state's request Holmes was kept in the courtroom during the rebuttal evidence. Frank Wrzos confirmed his earlier testimony that he could not identify either gunman. He again said that the larger gunman had used a brown paper sack as a container for the loot. Eleanor Grimms stated positively that Holmes was not one of the gunmen on December 8, 1963, and testified on cross-examination that she was wearing a blue sweater and slacks. Holmes had testified that this waitress had on some "pink thing," saying, "I don't know what it was, whether it was a dress."

Hans Markuson testified that he could not say "one way or the other" and that "I don't know, that is for sure," whether Holmes was the second gunman. Orville Block testified that Holmes was not one of the gunmen and that he "never saw the guy before." On cross-examination Block was unshaken, saying, "That isn't the guy." Frank King, when asked if Holmes could have been the gunman, said that "it doesn't seem to me that it's him." King was asked on cross-examination:

"Q.  * * * Do you think you might have mistaken one for the other?

"A.  No, I don't."

Carl Faber also testified that Ronald Holmes was not one of the holdup men.

Detective Eugene Wilson was also called in rebuttal. He testified that he had talked to Holmes in the State Prison on April 17, 1964, and that at that time Holmes told Wilson that he had not participated in the robbery, had no "direct evidence" to offer in the matter, and had not been with Collins or Scavo on the day of the holdup. Wilson also

testified that Holmes had told him he "couldn't see a couple feet in front of him" without his glasses.

During the recess called when Holmes claimed the privilege against self-incrimination, a reporter for the Minneapolis Tribune remained in the courtroom while the court and lawyers were in chambers and the jurors were out of the courtroom. At this time Holmes remained in the witness chair while defendant was seated at the customary place at the counsel table. The reporter, James S. Parsons, testified that he heard Holmes say to defendant, "Ask Scavo how much it was," to which Collins replied, "Twenty-seven hundred." Parsons stated he was about 12 feet behind defendant at the time of this conversation and that defendant's wife was seated behind Parsons.

Following the state's rebuttal testimony, defendant called two witnesses in an attempt to reduce the effect of the conversation testified to by Parsons—the deputy sheriff, who had been present and testified he had not seen or heard a conversation between defendant and Holmes, and a guard from the State Prison, who stated that he had recently weighed Holmes and found his weight to be 179 pounds. The case was then given to the jury, and after 9 hours deliberation it returned a verdict of guilty.

■ Defendant contends that the evidence does not sustain a conviction. In considering this claim we are governed by the rule that on appeal this court must take the evidence most favorable to the state, in whose favor the verdict was returned, and must assume that the jury believed the state's witnesses and disbelieved anything which contradicted their testimony. State v. Thompson, 273 Minn. 1, 139 N. W. (2d) 490; State v. Homme, 226 Minn. 83, 32 N. W. (2d) 151; State v. Schabert, 222 Minn. 261, 24 N. W. (2d) 846, 31 Minn. L. Rev. 375.

We are also governed on a criminal appeal by the same rules as apply in any other case. This was made clear in the recent case of State v. Norgaard, 272 Minn. 48, 52, 136 N. W. (2d) 628, 631, wherein this court said:

"In passing upon the weight and sufficiency of the evidence we can

only repeat that the scope of our review is limited to ascertaining whether under the evidence contained in the record the jury could reasonably find the accused guilty of the offense charged. If the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that defendant was proven guilty of the offense charged, a reviewing court will not disturb its verdict."

See, also, State v. Markuson, 261 Minn. 515, 113 N. W. (2d) 346.

■ Defendant contends that certain testimony by Detective Wilson suggested the existence of other criminal charges against defendant. He claims that he was prejudiced by such testimony and thereby denied a fair trial. An examination of the record indicates that defendant's counsel asked Wilson when he was assigned to this case and Wilson responded, "I believe it was in the first part of the year, in January, when Captain Egeland assigned us to several cases." The defense contends that his reference to several cases implies that those cases involved defendant. Wilson later stated that he became active on the case on February 6, 1964. Defendant's counsel then asked whether that date was the first one shown "in the records," and Wilson replied, "On this particular case, yes." Defendant's counsel took no objection to the foregoing statements by Wilson. Defense counsel in cross-examining this witness asked the following question:

"Q. Well, then, what made you think on February 8th or 9th that you would be asked here if you were intoxicated?

"A. Because I had heard that Mr. Collins was going to try to embarrass me because of the investigation we were making of him and his associates * * *."

It would appear that the answer is clearly responsive to the question asked by defendant's counsel and that it does not make any reference to any other charge against defendant since Wilson was, at the time referred to, investigating this case.

If there was any prejudice connected with Wilson's testimony, it was surfaced by defense counsel as the record indicates that all of the allegedly offending responses by the witness Wilson came during his

cross-examination. Moreover, no timely objection was made against the evidence now questioned. See, State v. Housker, 273 Minn. 42, 139 N. W. (2d) 474; State v. Biehoffer, 269 Minn. 35, 129 N. W. (2d) 918. Later, in chambers defense counsel objected to Wilson's answers as not responsive. The trial court overruled the objections. We fail to see how any reversible error can be predicated on that ruling. Whatever harm, if any was done, occurred when the answers were made, at which time there was no objection. Nor did the defense move to strike the answers. However, when asked by the state's counsel whether defendant wanted to ask for a mistrial at that stage of the proceedings, defendant's counsel replied, "I am making my record and I have made it."

Were we to assume that Wilson's answers were as damaging as is now claimed by defendant, the strategic maneuver employed by defendant's counsel is inadequate to preserve any alleged error for appeal.

Defendant cites State v. Currie, 267 Minn. 294, 126 N. W. (2d) 389, in support of his contentions. However, in that case the offending questions were asked by the prosecuting attorney and this is not the case here. Defendant also cites State v. Wofford, 262 Minn. 112, 114 N. W. (2d) 267. There the defendant was convicted of the crime of assault in the second degree and the state was allowed to show that the accused had committed the crime of robbery 10 days before the commission of the offense for which he was on trial. Clearly, neither case is controlling here.

■ Defendant claims that Detective Wilson's testimony that he had shown photographs of defendant to four persons, two of whom were not witnesses at the trial, and had shown photographs of Holmes to various persons who had been in the bar at the time of the robbery, suggested to the jury that all persons who had seen the photographs had identified defendant as the robber and was therefore prejudicial. We cannot agree that this testimony had such an effect.

Defendant also contends that the testimony on the part of the state to the effect that he was identified at the Hennepin County courthouse by a witness for the state also suggested the existence of other criminal charges against him and was prejudicial to the extent of deny-

ing him a fair trial. We cannot see that the evidence challenged had this effect and hold that it was admissible.

■ Defendant asserts that the rebuttal testimony of Detective Wilson and Mr. Parsons, offered to impeach Holmes, was improperly received because of a lack of foundation, a lack of inconsistency between statements made at the trial by Holmes and the impeaching testimony, and a lack of relevancy to a material issue in the case.

Defendant's argument as to lack of foundation for the impeaching testimony was not the basis of either of his motions for a new trial, nor was any objection made at the trial on that ground. This point is therefore not reviewable on this appeal. See, Goss v. Goss, 102 Minn. 346, 113 N. W. 690; State v. Johnson, 221 Wis. 444, 267 N. W. 14; Jones, Evidence (2 ed.) § 2402, p. 4735; 19 Dunnell, Dig. (3 ed.) § 9739; 98 C. J. S., Witnesses, § 599. Defendant cites Carroll v. Pratt, 247 Minn. 198, 203, 76 N. W. (2d) 693, 697, as controlling, but such objection was made at trial in the Carroll case.

Detective Wilson's testimony that Holmes had stated that without glasses he "couldn't see a couple feet in front of him" was clearly relevant and contradictory of Holmes' testimony. Defendant concedes that "all witnesses agreed that the robber did not wear glasses." Certainly this impeaching testimony demonstrated the unlikelihood that Holmes would attempt an armed robbery in a public place without his glasses and went to the very credibility of Holmes' story that he was the second robber.

Wilson's testimony that Holmes had denied participation in or direct knowledge of the holdup and Parsons' testimony that he had heard Holmes telling defendant to ask Scavo the amount of the robbery were also properly received as impeachment evidence.

■ The suggestion on the part of the defense that the state had an obligation to call Scavo and Holmes has no merit. Both came to the trial as alibi witnesses for the defense and as such were properly called first by the defendant. Defendant also contends that after it was known that Parsons would be called as a rebuttal witness the court should have made Holmes its own witness. This point also is without merit. Under the Anglo-American trial system, the parties and their coun-

sel have the primary responsibility for finding, selecting, and presenting the evidence, and it is generally held that the trial court has no affirmative duty to call a witness on its own initiative. See, State v. Hines, 270 Minn. 30, 133 N. W. (2d) 371; State v. Axilrod, 248 Minn. 204, 208, 79 N. W. (2d) 677, 681; McCormick, Evidence, § 8.

■ The defense contends that the trial court improperly permitted the prosecution, after Holmes had testified, to recall eyewitnesses to the robbery who had been unable to identify defendant as one of the robbers. The witnesses, however, were called in order to ascertain whether they recognized Holmes as the second robber. Clearly, the trial court's decision to permit the state to recall these witnesses, as well as the eyewitnesses to the robbery who were able to make an identification during the state's case in chief, constituted a sound exercise of discretion consistent with commonsense. It had developed that three witnesses were unable to identify the defendant as the second and taller gunman. Under the circumstances, it was proper to call these witnesses to state whether they could identify Holmes. There is no indication that the answers elicited from these three witnesses were in any way prejudicial to defendant. Had they not been permitted to testify on recall, the jury might have been left to speculation that their failure to identify defendant as the gunman on direct examination was attributable to the fact that Holmes rather than defendant was the second robber. The rule is well established that what is proper rebuttal evidence rests almost wholly in the discretion of the trial court. Briggs v. Chicago G. W. Ry. Co. 248 Minn. 418, 427, 80 N. W. (2d) 625, 633. We conclude that the trial court's exercise of discretion in permitting these witnesses to testify in rebuttal was logical and reasonable.

■ Defendant claims that he was denied a fair trial by reason of the publication of a certain newspaper article during the trial, the last sentence of which read:

"Joseph Robbie is defending Collins, who has another robbery charge hanging over his head from a supermarket robbery in March 1963."

Defendant was aware of the publication of the article during the trial but nevertheless, through his counsel, informed the court that he did not wish any inquiry made of the jurors. Under those circumstances the trial court fulfilled its only remaining obligation by repeatedly instructing the jury not to read any newspaper articles about the case. On his first motion for a new trial defendant failed to show that the article had resulted in any prejudice. Finally, a year after the jury's verdict, defendant presented an affidavit obtained from a single member of the trial jury, which stated:

"On the morning the case went to the jury, I noticed an article in the morning edition of the Minneapolis Tribune which related to the case. I think, as nearly as I can recall, that there were accompanying pictures of Ronald Holmes and Gerald Collins. I read at least part of the article, but after a year has passed, it is difficult for me to say how much."

Defendant contends that, since the juror admittedly read part of the article and did not say that he had read only part of it, he must have read all of it. He also asserts that the prejudicial effect of the article must be judged by its contents and by the verdict which the jury returned. Clearly, in urging that the juror who admitted he had read part of the article necessarily read all of it, defendant asks this court to engage in conjecture and speculation. His conclusion simply does not follow from the premise. Moreover, it appears that defendant now seeks to impeach the affidavit which he himself offered as evidence. Whatever difficulties defendant may have in this respect stem from his refusal to take appropriate action during the trial, when his counsel informed the court that defendant did not wish the jury questioned concerning whether any of the jurors had read the article. At the time of the first motion for a new trial defendant's counsel also failed to ascertain whether any juror had read the story, but instead, a year later, defendant secured the affidavit and presented the same as "newly discovered evidence." We fail to sense from the record as a whole that defendant has shown any prejudice resulting to him from the publication of the article under the circumstances.

■ In State v. Thompson, 273 Minn. 1, 33, 139 N. W. (2d) 490,

513, this court laid down the standards applicable to claims of prejudicial publicity:

"* * * [B]efore the fact that a juror may have read a newspaper article discussing certain aspects of the case will furnish the basis for a new trial it must appear (1) that the juror did read such article and was influenced thereby to the prejudice of the defendant; and (2) that, having knowledge of the fact prior to the submission of the case to the jury, the defendant requested appropriate action by the court.

"If, having knowledge of the alleged misconduct, defendant chooses nevertheless to proceed with the trial to completion, it must be held that he has waived the irregularity.

"The same rule is followed here as with respect to other misconduct of the jury. Whether a new trial should be granted or not rests largely in the discretion of the trial court, who has an opportunity to ascertain whether any prejudice has resulted."[1]

Defendant insists that his proof that one juror read part of the article is alone sufficient to show prejudice, citing in support of his contention Gruenhagen v. Brelje, 252 Minn. 203, 89 N. W. (2d) 738. In that case, however, the court said (252 Minn. 209, 89 N. W. [2d] 742):

"* * * But, even where there is evidence that a juror has read a news article claimed to be prejudicial, it is generally held that the disposition of the matter rests within the sound discretion of the trial court."

See, also, State v. Harris, 62 Wash. (2d) 858, 385 P. (2d) 18; Williams v. Anderson (D. Del.) 245 F. Supp. 185, 187.

Defendant relies upon Marshall v. United States, 360 U. S. 310, 79 S. Ct. 1171, 3 L. ed. (2d) 1250. That case was predicated upon the supervisory power of the United States Supreme Court over the inferior Federal courts and has been closely restricted to its facts, even by

---

[1] See, Gicinto v. United States (8 Cir.) 212 F. (2d) 8; United States v. Pisano (7 Cir.) 193 F. (2d) 355, 31 A. L. R. (2d) 409; Marshall v. United States (9 Cir.) 355 F. (2d) 999; Halko v. Anderson (D. Del.) 244 F. Supp. 696; United States v. Jannsen (7 Cir.) 339 F. (2d) 916; State v. Ellis, 271 Minn. 345, 364, 136 N. W. (2d) 384, 396.

the Federal courts. See, Marshall v. United States (9 Cir.) 355 F. (2d) 999, 1006; Halko v. Anderson (D. Del.) 244 F. Supp. 696.

Nor do we think the other cases cited by defendant support his contention that he has established prejudice because one juror was shown to have read part of the article. In People v. Gambino, 12 Ill. (2d) 29, 145 N. E. (2d) 42, the court noted that the appellant failed to allege that any juror had read the article claimed to be offending and said that such showing was a prerequisite to a finding of prejudice. In the later case of People v. Malmenato, 14 Ill. (2d) 52, 62, 150 N. E. (2d) 806, 812, the trial court on interrogation found that one juror had read a newspaper article. When the juror stated that he would not be influenced by it, the trial court refused to declare a mistrial and his decision was affirmed. The holding in Holmes v. United States (4 Cir.) 284 F. (2d) 716, 97 A. L. R. (2d) 782, also cited by defendant, was predicated upon the prejudicial comments of a deputy marshal to a juror. Estes v. Texas, 381 U. S. 532, 85 S. Ct. 1628, 14 L. ed. (2d) 543, concerned the televising of a criminal trial. Irvin v. Dowd, 366 U. S. 717, 81 S. Ct. 1639, 6 L. ed. (2d) 751, is distinguishable in that two-thirds of the jurors had an opinion and believed petitioner was guilty.

In United States v. Bowe (2 Cir.) 360 F. (2d) 1, 11, the court said:

"* * * Whether publicity is so prejudicial that it forecloses the possibility of a fair trial is a determination which is well-suited for the trial judge since he has an opportunity to observe the impact of publicity on the jurors. Consequently, he should have wide discretion to assess such matters and his view should be determinative unless that discretion be abused."

Cf. Delaney v. United States (1 Cir.) 199 F. (2d) 107; Sheppard v. Maxwell, 384 U. S. 333, 86 S. Ct. 1507, 16 L. ed. (2d) 600.

The record is clear that when the allegedly offending newspaper article was discovered by defendant's counsel he directed that no inquiry be made of the jury and further stated:

"* * * I am anxious to have a jury have a crack at the facts in this case * * *. I want the trial to go ahead, obviously."

(Two mistrials had been declared before this trial.) It would thus seem that defendant waived the misconduct of the juror who had seen the article. State v. Thompson, *supra.* In any event the trial court did not abuse its discretion in refusing to grant a new trial on this ground.

■ Defendant contends that the prosecutor's argument was improper in referring to the preliminary hearing; in referring to a supposed friendship between Scavo and Holmes, on the one hand, and defendant, on the other; in arguing that Holmes' testimony was fabricated by the defendant and his alibi witnesses; and in saying that the crime had been committed by "real criminals." Defendant claims that the cumulative effect of these remarks was to deprive him of a fair and impartial trial. While he cites numerous cases and authorities to support his contentions, none of them, as we view the record and the argument, establishes that the argument was not within the bounds of propriety.

We think that defendant's contentions concerning the prosecutor's final argument are amply answered in the recent decision of this court in State v. Ellis, 271 Minn. 345, 368, 136 N. W. (2d) 384, 398, and in State v. Guevara, 270 Minn. 356, 360, 133 N. W. (2d) 492, 495. In the Guevara case this court said:

"Whether a new trial should be granted because of misconduct of the prosecuting attorney is discretionary with the trial judge. Since the conduct complained of occurred in his presence, he is obviously in the best position to appraise its effect. His determination should be reversed on appeal only where the misconduct, viewed in the light of the whole record, appears to be inexcusable and of such serious and prejudicial consequence that our responsibility requires us to conclude that defendant's constitutional right to a fair trial was impaired."

The trial judge in denying defendant's motions for a new trial rejected defendant's claim that the assistant county attorney's remarks were improper, saying:

"* * * I have read the final argument in the light of your argument

here, and it seems to me that the statements made by the prosecuting attorney were within permissible limits."

There was no abuse of discretion in this ruling.

· ■ The record clearly demonstrates that the identification of the defendant was sufficient to sustain defendant's conviction. In State v. Bailey, 235 Minn. 204, 207, 50 N. W. (2d) 272, 274, this court observed:

"The testimony of the prosecuting witness identifying defendants was properly submitted to the jury. Courts are liberal in deciding whether such testimony is sufficient to uphold a conviction."

In State v. Sutton, 272 Minn. 399, 138 N. W. (2d) 46, this court applied that principle in affirming a felony conviction based upon eyewitness identification far short of that in this case. There the defendant rested his appeal from the judgment solely on the claim that the evidence was insufficient to identify him as the person who committed the offense charged. Out of five identification witnesses called by the state only one could positively identify the defendant.

Neither State v. Anderson, 272 Minn. 384, 137 N. W. (2d) 781, nor State v. Kemp, 272 Minn. 447, 138 N. W. (2d) 610, cited by defendant, is applicable here. Thus, applying well-settled rules, we are persuaded that the evidence here was sufficient to sustain the jury's determination of guilt beyond a reasonable doubt, even though the eyewitnesses' testimony bespeaks the possibility of error.

We think the trial judge fairly and intelligently phrased applicable instructions to the jury on that issue:

"It is not at all unusual when witnesses fail to tell the same story as to what happened or what was said in connection with a transaction such as this. These differences in what witnesses say may be the result of the fact that one or more of them may not be telling the truth, but that is not necessarily so. A witness may not have been paying attention when the event involved occurred, so that what he tells you may not be too clear in his own mind. He may have been distracted by the circumstances surrounding the event which he attempts to relate. A witness may not have been in a position where he could observe

the happening well, if he could observe it at all. The memory of one person may not be as retentive as that of another. The power of expression varies from one person to another. One may be able to express himself well, another may express himself only with difficulty. Not all persons have the same power to observe, even though they have equal opportunity to do so."

We are satisfied that the case was fully and fairly tried. In the final analysis it resolves itself into a simple fact issue which a jury of 12 unanimously decided adversely to defendant. Three of six eyewitnesses identified defendant as the gunman in question. No eyewitness said the defendant was not the gunman and not a single eyewitness picked alibi witness Holmes as the second gunman—an unlikely occurrence if Holmes' story had been true. The jury by its verdict clearly preferred the testimony of the state's disinterested eyewitnesses to the testimony of the two alibi witnesses, Holmes and Scavo. The whole background and the course of the trial on the record presented indicates that the defendant was fully afforded his day in court. The evidence amply sustains his guilt beyond a reasonable doubt, and the judgment of conviction and orders denying a new trial must be affirmed.

Affirmed.