STATE of Minnesota, Respondent,

v.

James Shane SWANSON, Appellant.

No. C2–92–314.

Supreme Court of Minnesota.

April 9, 1993.

John Stuart, State Public Defender, Michael F. Cromett, Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Robert A. Stanich, Special Asst. Atty. Gen., St. Paul, and Bradley C. Rhodes, Aitkin County Atty., Aitkin, for respondent.

KEITH, Chief Justice.

On July 3, 1991, an Aitkin County grand jury returned a five-count indictment charging defendant, James Shane Swanson, with the following offenses in connection with the kidnapping, rape, and murder of Carin Streufert on June 15, 1991, in Itasca and Aitkin Counties: one count of first degree premeditated murder, Minn. Stat. § 609.185, subd. 1 (1992); three counts of first degree felony murder, Minn. Stat. § 609.185, subds. 2–3 (1992); and one count of kidnapping, Minn.Stat. § 609.25, subds. 1(2), 2(2) (1992). Prior to trial, venue was transferred to Beltrami County.

On December 14, 1991, a Beltrami County jury returned verdicts of guilty on all charges, and on December 17, 1991, defendant was sentenced to life imprisonment for the first degree murder conviction and a consecutive sentence of 91 months for kidnapping. Defendant appealed to this court, asserting that (1) the evidence was insufficient as a matter of law to sustain his convictions; (2) the trial court committed prejudicial error by admitting into evidence the transcripts of his taped statements to police; (3) the trial court erred by admitting evidence of defendant's encounter with another woman the night of the murder in rebuttal of defendant's testimony that he was not planning to kidnap someone that night; and (4) the trial court erred by sentencing defendant to life imprisonment with a consecutive term of 91 months for kidnapping. We affirm.

On June 14, 1991, Carin Streufert, an 18–year–old college student, went to a Perkins Restaurant in Grand Rapids with some friends between 12:30 and 1:00 a.m. Around 2:45, Streufert departed. Although another friend offered her a ride home, Streufert decided to walk.

When Streufert had not returned home the next morning, her disappearance was reported to the sheriff's office. Within hours, search crews were dispatched to search for her, albeit without success.

On June 18, at a party at defendant's house, defendant told Bill Hollom, who was his sister's boyfriend and a trainee in a law enforcement program, that he knew every-

thing about the Streufert murder. He said that he and Guy Sullivan had been with two strangers that night and that the two strangers, Ralph and Neil, committed the murder while he and Sullivan watched. Later that evening, defendant also told his father the story about the murder involving the two strangers. His father did not totally believe defendant and told him to turn himself in to police. Defendant then called Guy Sullivan and went with his father to turn himself in between 2:30 and 3:00 a.m.

Upon arriving at the police station, defendant voluntarily told police that he had information on Carin Streufert's disappearance. He told police that he and Guy Sullivan had met two strangers named Ralph and Neil at a bar in Grand Rapids, and after picking up Streufert, the five of them drove to a wooded area 30 miles south of town. Defendant said that he was standing about 15 feet away from the strangers when they shot Streufert.

Police asked defendant if he was telling the truth and informed defendant that Sullivan was in the adjoining room telling police that the defendant had fired the shots at the victim. Defendant admitted that part of his story was fabricated, and he asked to see Sullivan. When defendant got the opportunity to do so, he asked Sullivan if he should "tell the whole thing." When Sullivan indicated that he should, defendant told police that most of the previous story was false.

Defendant proceeded to recant his initial story and told police a second story in which he implicated himself and Sullivan in the murder. Defendant told police that he and Sullivan decided to pick up a woman and "terrorize" her that night, and when they saw Streufert leave the Perkins Restaurant, defendant said, "Let's go for it." When Sullivan pulled his car alongside Streufert, defendant got out of the car and told Streufert to get in. When she refused, defendant put his hand on her shoulder, and Sullivan revealed the .25 caliber automatic pistol between his legs. She then got into the car.

Sullivan and defendant drove Streufert to the wooded area defendant had previously described, and defendant confessed that both men raped her. When they decided that Streufert might tell police about the incident, defendant said that he shot her in the back of the head with the .25 caliber pistol and then, after she fell, fired a second shot into her throat with a .22 pistol. After this confession, defendant agreed to take the sheriff to the place where he had buried the body. After doing so, they returned to the sheriff's office. Defendant was told that he was free to go but that he would be arrested soon.

Defendant was arrested shortly after leaving the police station. After he was given a *Miranda* warning, defendant again confessed to Streufert's murder, providing details which matched his prior confession. Defendant once again reiterated that he and Sullivan followed Streufert, forced her into the car, took her to the wooded area, raped her, and shot her. Defendant admitted firing the fatal shots, and he told police about his attempted cover-up, including partially burying Streufert's body and throwing her handbag out onto the highway. He even contemplated removing the gun slugs from the back of her head so that they could not be traced back to his guns. Defendant said, "I'm admitting I'm guilty." When police told him that Sullivan said that defendant had forced Sullivan at gunpoint to perform these acts, defendant disagreed, stating that they were in it "50–50."

At trial, defendant recanted his earlier statements, indicating that he and Sullivan had made up these stories in an attempt to protect Sullivan. Defendant claimed that he was willing to sacrifice his life to exonerate Sullivan.

Defendant testified that he and Sullivan saw Streufert leaving Perkins and drove up to her because Sullivan thought he knew her. Streufert voluntarily got into the car, and they proceeded to drive to the wooded area in Aitkin County. During the trip, defendant testified that Sullivan and Streufert had a friendly conversation about school. Defendant claimed that although

he slept only three hours in the 14 days preceding the murder, the Eferdrine pills he was taking[1] caused him to be "zonked out" in the back seat.

When they arrived at the wooded area, they made a fire. When the fire started dying out, defendant went to get some more wood, and upon returning, he said Sullivan and Streufert were having sexual intercourse. Defendant left them alone. After this, Sullivan and Streufert headed up the trail, and after a while, defendant went to look for them. Upon reaching Sullivan, defendant testified he saw Streufert lying dead on the ground, with Sullivan holding a gun. Defendant said that after Sullivan told him what happened, he agreed to help his friend and therefore fired the second shot into her neck.

On the return trip to Grand Rapids, defendant said that Sullivan told him that he had raped Streufert. Defendant threw Streufert's handbag onto the highway, and during the trip they concocted the phony story about the two strangers, Ralph and Neil, and later developed another story in which defendant would admit pointing a gun at Sullivan and forcing him to perform these acts. Although this latter story best accomplished defendant's purported goal of exonerating Sullivan, defendant claimed that he did not tell police this story initially because he and Sullivan had not worked out all the details on it.

## I.

Defendant asserts that the evidence was insufficient as a matter of law to sustain his convictions. In reviewing such claims, the applicable standard of review provides:

In reviewing a claim of insufficiency of the evidence, we are limited to ascertaining whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged.

*State v. Merrill,* 274 N.W.2d 99, 111 (Minn. 1978) (citations omitted). This court cannot

retry the facts and is "limited to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Webb,* 440 N.W.2d 426, 430 (Minn.1989) (citation omitted).

In this case, the evidence of defendant's guilt was overwhelming. The defendant voluntarily went to the police, initially telling them a false story about two imaginary strangers named "Ralph and Neil," followed by a second story in which defendant admitted to kidnapping, raping, and killing Streufert. After being formally arrested, defendant was given a *Miranda* warning and then once again proceeded to implicate himself in the victim's murder. He admitted that he and Sullivan had decided to abduct a woman that night, that they both raped Streufert, that he had fired both fatal shots into the victim, and that he had attempted to cover up the crime. Testimony at trial also revealed that defendant had written a letter to the Grand Rapids Chief of Police in which he thanked police for their work and said he was sorry for what he had done as well as "for the family of the girl we killed." Thus, the evidence presented at trial was consistent with the hypothesis that defendant was guilty and inconsistent with any rational hypothesis except that of guilt. *State v. Race,* 383 N.W.2d 656, 662 (Minn.1986).

## II.

Defendant claims that the trial court's admission into evidence of the transcripts of his tape-recorded conversations with police constituted reversible error because it was not the best evidence, was cumulative, and violated his rights to due process and a fair trial. Although the trial judge originally excluded the transcripts, the court later admitted them under Minn. Stat. § 611.033. This statute provides:

A statement, confession, or admission in writing shall not be received in evi-

---

**1.** Eferdrine pills are amphetamines, and defendant claimed that while he initially took 3–5 pills per day for his asthma, he was taking nearly 200/day at the time of the murder.

dence in any criminal proceeding against any defendant unless within a reasonable time of the taking thereof the defendant is furnished with a copy thereof and which statement, confession, or admission shall have endorsed thereon or attached thereto the receipt of the accused or certification of a peace officer which shall state that a copy thereof has been received by or made available to the accused. Nothing in this section requires that a videotape, audiotape, or transcript of a tape be given to the defendant at the time the statement, confession, or admission is made or within a reasonable time thereafter, provided that the videotape or audiotape is available to the defendant or the defendant's attorney for review within a reasonable time of the defendant's arrest, as well as in discovery pursuant to the rules of criminal procedure.

Minn.Stat. § 611.033 (1992).

Both parties concede that the first sentence of the statute was not satisfied because defendant never signed for these transcripts nor was he ever furnished with a copy of them. However, the state argues that the inclusion of the language, "or transcript of a tape," in the second sentence makes this transcript admissible. This latter phrase, however, relates only to the accused's right to access such tapes or transcripts, not to their admissibility at trial. In order to be admissible at trial under the provisions of this statute, the requirements established in the first sentence must be met. These conditions were not met in this case.

Minnesota case law also supports the conclusion that the introduction of such evidence was error. In addressing the issue of transcript admissibility, this court has adopted the following guidelines:

"If accuracy remains an issue, a foundation may first be laid by having the person who prepared the transcripts testify that he has listened to the recordings and accurately transcribed their contents. Because the need for transcripts is generally caused by two circumstances, inaudibility of portions of the tape under the circumstances in which it will be re-

played or the need to identify the speakers, it may be appropriate, in the sound discretion of the trial judge, to furnish the jurors with copies of a transcript to assist them in listening to the tapes. In the ordinary case this will not be prejudicially cumulative. Transcripts should not ordinarily be read to the jury or given independent weight. The trial judge should carefully instruct the jury that differences in meaning may be caused by such factors as the inflection in a speaker's voice or inaccuracies in the transcript and that they should, therefore, rely on what they hear rather than on what they read when there is a difference. *Transcripts should not ordinarily be admitted into evidence unless both sides stipulate to their accuracy and agree to their use as evidence.*"

State v. Olkon, 299 N.W.2d 89, 103 (Minn. 1980), *cert. denied,* 449 U.S. 1132, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981) (emphasis added) (citations omitted) (*quoting United States v. McMillan,* 508 F.2d 101, 105–06 (8th Cir.1974), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975)). This standard has been upheld in subsequent cases. *See State v. Ture,* 353 N.W.2d 502 (Minn.1984); *State v. Czech,* 343 N.W.2d 854 (Minn.1984).

Although we have upheld the trial court's discretion in allowing the jury to use such transcripts, *see, e.g., Olkon,* 299 N.W.2d at 103–04, these prior cases have involved the issue of whether a jury may follow along with a transcript while a tape is played, not whether the transcript itself may be admitted into evidence. Because the parties in this case did not stipulate to the accuracy of the translations or agree to their use as evidence, as required by *Olkon,* the admission of these transcripts was error.

Nevertheless, this court has held that any error committed in admitting statements in violation of section 611.033 is harmless beyond a reasonable doubt when no constitutional right was violated, another and more damaging confession was properly admitted, and the officer could have orally provided the same evidence by using the tape as a refreshing memoran-

dum. *State v. Johnson*, 256 N.W.2d 280, 285 (Minn.1977). In this case, the officer who took the statements compared them to the transcripts and testified that each was true and accurate. In addition, the defendant is unable to point to any substantive inaccuracies in the transcripts, his taped admissions were otherwise admissible, he did not request a limiting instruction, and the evidence of his guilt was overwhelming. Thus, the admission of the transcripts into evidence was harmless error.

### III.

The defendant claims that Meredith Freeberg's testimony on rebuttal constituted improper *Spreigl* evidence because it was introduced to prove that defendant had attempted to kidnap another woman that night. *See State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965).

■ Freeberg's testimony, however, was not admitted as *Spreigl* evidence of a prior attempted kidnapping but rather as rebuttal evidence. Defendant testified at trial that he and Sullivan were merely "cruising" around town looking for a party and that he did not believe that they had followed Freeberg that night. In rebuttal, Freeberg testified that two men walked toward her that night, watched her continuously, spoke to her in a menacing manner, and watched her continuously until she was inside her house. She later picked Sullivan out of a police lineup and was able to identify defendant at trial.

In general, rebuttal evidence consists of that which explains, contradicts, or refutes the defendant's evidence, *State v. Gore*, 451 N.W.2d 313, 316 (Minn.1990), and "the determination of what constitutes proper rebuttal evidence rests almost wholly in the discretion of the trial court." *State v. Eling*, 355 N.W.2d 286, 291 (Minn.1984) (*citing State v. Collins*, 276 Minn. 459, 473, 150 N.W.2d 850, 860 (1967), *cert. denied*, 390 U.S. 960, 88 S.Ct. 1058, 19 L.Ed.2d 1156 (1968)). Freeberg's testimony tended to rebut defendant's claim that he was not stalking women that night and to affirm his earlier police statements that he and Sullivan were looking to "terrorize" or "ab-duct" a woman. Thus, it was within the trial court's considerable discretion to allow Freeberg's testimony as rebuttal evidence.

### IV.

Finally, defendant argues that the trial court erred in sentencing defendant to life imprisonment for first degree murder and a consecutive 91–month sentence for kidnapping. Defendant contends that the sentences should be modified to run concurrently because the offenses were against a single victim and arose out of a single behavioral incident.

■ In fact, Minnesota statutes expressly permit consecutive sentences to be imposed for multiple offenses committed against the same victim in a single behavioral incident where one of the offenses is kidnapping. Minn.Stat. § 609.251 (1992). In addition, first degree murder is excluded from the Minnesota Sentencing Guidelines. *See* Minnesota Sentencing Guidelines II.A.

■ Furthermore, in deciding whether to impose consecutive sentences, this court considers whether consecutive sentences "are commensurate with culpability and not an exaggeration of defendant's criminality." *Bangert v. State*, 282 N.W.2d 540, 547 (Minn.1979). Here, defendant kidnapped, raped, and killed Carin Streufert, attempted to cover up the crime, and initially lied about his involvement to the police. Thus, because kidnapping was involved and the resulting sentence did not exaggerate defendant's criminality, we cannot say that the trial court abused its discretion in imposing life imprisonment plus a consecutive 91–month sentence for kidnapping.

Affirmed.

WAHL, Justice (concurring specially).

I concur with the affirmance of defendant's conviction but I would modify defendant's sentences to run concurrently because consecutive sentences under the circumstances of this case unfairly exaggerate the criminality of defendant's conduct. In *State v. Patch*, 329 N.W.2d 833, 837 (Minn.1983), we stated that "Minn.Stat. § 609.035 generally bars sentencing a de-

fendant more than one time, even to concurrent sentences, for multiple offenses committed against the same victim as part of a single behavioral incident." The purpose of this statute, as we had previously recognized, is "to protect against exaggerating the criminality of a person's conduct and to make both punishment and prosecution commensurate with culpability." *State ex rel. Stangvik v. Tahash*, 281 Minn. 353, 360, 161 N.W.2d 667, 672 (1968). In 1983, the legislature amended section 609.035 and added Minn.Stat. § 609.251 so that a defendant may be convicted and sentenced for kidnapping and for the crime facilitated by the kidnapping. *State v. Crocker*, 409 N.W.2d 840, 845 (Minn.1987). Even so, under the Minnesota Sentencing Guidelines and Commentary II.F. when an offender is convicted of multiple current offenses against a single victim, concurrent sentences are presumed, with three exceptions not relevant here.[1] Kidnapping is an offense covered by the sentencing guidelines, first degree murder is not. It makes no sense, however, as defense counsel has argued, to exclude murder first from the guidelines' principles of rationality and proportionality. Here, where defendant is convicted of the most serious crime under our laws, with life imprisonment mandated by law, consecutive sentences for multiple offenses against a single victim arising out of a single behavioral incident unfairly exaggerate the criminality of defendant's conduct. I would hold consecutive sentencing, under such circumstances, not permissible.

---

1. Consecutive sentences may be given only in the following cases: (1) when a prior sentence for a crime against a person has not expired, a current offense is for a crime against a person, and the guidelines call for an executed sentence; (2) there are multiple current offenses against different persons, and the guidelines call for an executed sentence; or (3) where the offense is for escape (or is an offense committed while serving an executed prison sentence). Minnesota Sentencing Guidelines and Comments, II.F.1–3.