## STATE v. PETER A. SHEVCHUK AND ANOTHER.

163 N. W. (2d) 772.

December 27, 1968—Nos. 41061, 41068.

*C. Paul Jones*, State Public Defender, and *Robert E. Oliphant*, Assistant State Public Defender, for appellants.

*Douglas M. Head,* Attorney General, *John C. Arko,* County Attorney, and *David Naughtin,* Assistant County Attorney, for respondent.

Heard before Knutson, C. J., and Nelson, Murphy, Peterson, and Frank T. Gallagher, JJ.

PETERSON, JUSTICE.

These companion appeals, arising out of companion criminal conduct, raise common issues. Defendants were each charged with kidnapping, aggravated assault, aggravated robbery, and the unauthorized use of a motor vehicle. They were separately tried. Defendant Peter A. Shevchuk was found guilty of simple assault, simple robbery, and unauthorized use of a motor vehicle. Defendant Michael R. Krampotich was found guilty of aggravated assault, simple robbery, and unauthorized use of a motor vehicle. Both were acquitted of kidnapping. Maximum sentences were imposed for each crime of which they were convicted, the sentences, with one exception, to be served concurrently. The issues on appeal are:

(1) Whether the evidence is sufficient to sustain the convictions of these crimes.

(2) Whether, as to defendant Krampotich, the trial court should have instructed the jury as to simple assault rather than aggravated assault only.

(3) Whether commission of the multiple crimes constituted a single behavioral incident and was thus subject to statutory restraint against multiple punishment.

(4) Whether the trial court abused its discretion in denying defendants' motions for change of venue because of prejudicial pretrial publicity.

■ The evidence so overwhelmingly supports each conviction that a detailed statement of the facts is not necessary. The criminal conduct occurred on the night of December 28, 1966, in the small town of Kelly Lake, 4 miles west of Hibbing, Minnesota. Defendants Krampotich and Shevchuk, together with one Albert Estey, came upon the automobile of the complaining witness, John Johnson, stopped on a deserted coun-

try road. Together they [1] assaulted Johnson, kicking him in the ribs and face with severely injurious force. A succession of threats and assaults continued over a period of some 2½ hours. Following the final assault, a blow on the nose by defendant Shevchuk which caused Johnson's blood to stain a 2-foot circle in the snow, Johnson escaped into the woods as a bullet ricocheted past his head.

After the initial assault, Johnson obeyed the command to "move over" in the seat, and the three assailants got into the car and drove off, one of them in the back seat and two of them flanking Johnson in the front seat. It is obvious that defendants' intentional taking and use of their victim's motor vehicle was unauthorized and hence a criminal act.[2]

A considerable time later, after they had stopped to buy beer, one of the three said to Johnson, "We want your wallet." Johnson handed it over without resistance and they took $40 from it. They removed and retained a wristwatch and a .22-caliber pistol under like circumstances.[3] Minn. St. 609.24 defines simple robbery in these terms:

"Whoever, knowing he is not entitled thereto, takes personal property from the person or in the presence of another and *uses or threatens the imminent use of force against any person* to overcome his resistance or powers of resistance to, or *to compel acquiescence in, the taking* or

---

[1] It is unnecessary in this opinion to identify the direct actor in most of the incidents which took place that night. The direct actor in each of the incidents was at some times one of the defendants and at other times Estey. The jury could well find, however, that each was a participant in all of the events and was thus criminally liable for the crimes committed by the others. Minn. St. 609.05, subd. 1. See, State v. Sutton, 277 Minn. 157, 152 N. W. (2d) 57; State v. Bellecourt, 277 Minn. 163, 152 N. W. (2d) 61.

[2] Minn. St. 609.55, subd. 2, provides: "Whoever intentionally takes and drives a motor vehicle without the consent of the owner or his authorized agent may be sentenced to imprisonment for not more than three years or to payment of a fine of not more than $3,000, or both."

[3] Defendants had bought the beer with some of Johnson's money. They drank most of it themselves, apparently giving two cans to Johnson to drink and pouring another over his head. Johnson's pistol was located later, buried in the dirt floor of a garage owned by Estey's father-in-law.

carrying away of the property is guilty of robbery and may be sentenced to imprisonment for not more than ten years or to payment of a fine of not more than $10,000, or both." (Italics supplied.)

Defendants' argument that no threat was used at the time and that Johnson voluntarily handed over his personal property is without merit. Actual force and threat of force had preceded the taking. The jury could well find that any apparent acquiescence of Johnson in the taking was only because of the pervasive threat of force against him. Quite apart from Johnson's own testimony that it was so, the jury could reasonably infer that he was put in a continuing state of fear that overcame his resistance.

Subsequently, while all three assailants were still in the automobile, Shevchuk removed Johnson's pistol from the automobile's glove compartment. After Estey had fired several shots out the car window, Krampotich took the gun, which had been reloaded, cocked it, and pointed it at Johnson's head. Krampotich said, "We don't care if we kill you. We are not afraid of the cops." When Johnson raised his arm to push the gun away, Shevchuk struck him and said, "Leave him [Krampotich] alone. He knows what he is doing." [4] Shevchuk testified that he himself grabbed the barrel of the pistol at that point and told Krampotich to be careful; and defendants thereafter fired several more shots out the car window and into the automobile itself. Krampotich's act was unquestionably an assault with a dangerous weapon and, therefore, an aggravated assault as charged in the information,[5] irrespective of the jury's more favorable finding as to Shevchuk.

■ Defendant Krampotich asserts that the trial court should have instructed the jury on the lesser offense of simple assault as well as that of aggravated assault. The charge of aggravated assault, however, related only to defendant's assault with a loaded pistol. The trial court was

---

[4] At yet another time one of the defendants stated they had a knife and said, "We should take this knife and cut him up a little bit."

[5] Minn. St. 609.225, subd. 2, provides: "Whoever assaults another with a dangerous weapon but without intent to inflict great bodily harm may be sentenced to imprisonment for not more than five years or to payment of a fine of not more than $5,000, or both."

careful to instruct the jury that the charge was so limited and that they were to disregard any other acts of assault. If the defendant did in fact, contrary to his denial, perpetrate that specific act, he was guilty of nothing less than aggravated assault; otherwise he was guilty of no assault whatever. As we held in State v. Tennyson, 212 Minn. 158, 166, 2 N. W. (2d) 833, 837, 139 A. L. R. 987, 993, it is proper to refuse a requested instruction to a lesser offense "if the evidence is unequivocal so as to permit only a finding of guilty or not guilty of the crime charged." See, also, State v. Norlander, 277 Minn. 436, 152 N. W. (2d) 774.

■ The most substantial issue raised on these appeals is whether the multiple punishments imposed by the trial court were authorized by statute. Minn. St. 609.035 provides:

"* * * [I]f *a person's conduct constitutes more than one offense under the laws of this state he may be punished for only one of such offenses* and a conviction or acquittal of any one of them is a bar to prosecution for any other of them. All such offenses may be included in one prosecution which shall be stated in separate counts." (Italics supplied.)

The objective and scope of the statute in prohibiting multiple prosecutions [6] and punishment where "a person's conduct constitutes more than one offense" has been extensively considered in several recent cases. In State v. Johnson, 273 Minn. 394, 404, 141 N. W. (2d) 517, 525, we held that the statute applied only to the situation where each crime resulted from a single behavioral incident, tested as follows:

"* * * [A]part from the factors of time and place, the essential ingredient of any test is *whether the segment of conduct involved was motivated by an effort to obtain a single criminal objective.*"

A factual test of such single criminal objective, as we implied in State v. Johnson, *supra*, and expressed in State v. Murphy, 277 Minn. 355, 152 N. W. (2d) 507, is whether all of the acts performed were necessary to or incidental to the commission of a single crime and motivated by an

---

[6] No issue as to the prosecution is now presented. The charges against each defendant were contained in separate informations and the prosecutions on each charge were consolidated for trial at the request of defendants.

intent to commit that crime. In State v. Reiland, 274 Minn. 121, 125, 142 N. W. (2d) 635, 638, we related the statute to a basic policy "to protect against exaggerating the criminality of a person's conduct by making both punishment and prosecution commensurate with culpability," and observed that the rule must be refined under case-by-case application.[7]

We conclude that the three crimes constituted a divisible series of incidents rather than a single behavioral incident. Although there was some unity of time in the sense that all the incidents occurred the same night, the incidents nevertheless occurred at clearly separate times during an extended period of some 2½ hours. There was, to be sure, a certain unity of place in the sense that all the incidents occurred in or by the automobile, but the automobile itself was moved from place to place and was not an essential instrumentality of the other two crimes.[8] The only behavioral relationship among the crimes was that defendants had embarked on a course of brutalizing and terrorizing their victim. There was no single criminal objective or prearranged program of events; each of the events, those charged in the informations and those not specifically charged, simply took place as an idea came into defendants' heads.

The unauthorized use of the motor vehicle took place at the very outset of the evening and was a separate incident and an end in itself. Although there were several assaults contemporaneous with the taking of

---

[7] A most recent application was in State ex rel. Stangvik v. Tahash, 281 Minn. 353, 161 N. W. (2d) 667, where defendant murdered his wife and two children at the same time. We held that the statute did not apply where the conduct constituted separate crimes intentionally committed against more than one individual and where the multiple sentences did not result in a term of confinement grossly out of proportion to the harm caused.

[8] This factual conclusion is rather implicit in the juries' acquittals on the charges of kidnapping. Minn. St. 609.25, subd. 1, provides: "Whoever, for any of the following purposes, confines or removes from one place to another, any person without his consent * * * is guilty of kidnapping * * *:

\* \* \* \* \*

"(2) To facilitate commission of any felony * * *; or

"(3) To commit great bodily harm or to terrorize the victim or another; or

"(4) To hold in involuntary servitude."

the motor vehicle, defendants were not charged with these assaults as separate crimes. The assaultive blow on the nose by Shevchuk and the assault with a pistol by Krampotich occurred 2 hours or more after the initial taking of the vehicle and bore no essential relationship to that offense. The initial assaults preceded the robbery, but the robbery preceded the other assaults of which defendants were found guilty, which means that the uncharged assaults bore a substantial relationship to the robbery as the actions which overcame Johnson's will or power to resist, but the subsequent aggravated assaults did not.

We think, moreover, that the punishment was not disproportionate to the culpability of defendants in the aggregate of their crimes. The state had urged that the sentences should be separate and consecutive for each, both because of the gravity of the crimes and the adverse prior records of defendants. The court, however, made the sentences concurrent,[9] except that Shevchuk was given a consecutive 90-day sentence to the St. Louis County Workhouse for his simple assault, subject to the court's retention of jurisdiction to reevaluate that sentence upon completion of the concurrent sentence for his other two crimes. Where the trial court has the authority to impose multiple sentences, it is not our function to assess the severity of the sentences imposed.

■ Defendants had moved before trial for a change of venue on the ground that pretrial newspaper publicity, consisting of three front-page articles in The Hibbing Daily Tribune, was of such nature as to make a fair and impartial trial impossible. The three articles were headlined variously as follows: "Three Area Youths Being Hunted On Kidnapping Charges"; "Three Area Youths Arrested On Kidnap-Assault Charges"; and "15,000 Bail Set In Kidnap." The articles were substantially a rec-

---

[9] We do not decide, where offenses are the result of a single behavioral incident, that *concurrent* punishments may be imposed notwithstanding the statute. Defendants urge that concurrent sentences are prejudicial in any case because, they argue, such multiple sentences may affect parole opportunity and may have some bearing on a defendant's later ability to get a job. This is not necessarily so, however, for it is probably the fact of multiple *convictions*, rather than the multiple *sentences*, which is likely to have any such adverse consequences.

itation of information contained in the complaints, based on Johnson's statements as the complaining witness. These complaints, of course, were public documents establishing probable cause for the issuance of the warrants of arrest. Although the headlines focused on the most serious crime of kidnapping, it is significant that the juries actually acquitted defendants of that crime. The newspaper publicity was free of any statement by responsible public authorities either expressing or intimating an opinion as to defendants' guilt. The voir dire of jury selection disclosed that most, but not all, had read one or more of these newspaper articles but that none of them had formed an opinion concerning the guilt or innocence of defendants as the result of such publicity. We think that the pretrial newspaper publicity was without substantial prejudice to a fair and impartial trial. We hold as we did in State v. Collins, 276 Minn. 459, 150 N. W. (2d) 850, that the trial court did not abuse its discretion in denying a change of venue.

Defendant Krampotich additionally asserts now that a change of venue should have been granted him because the jury was selected from the same jury panel as that which had previously sat in the Shevchuk trial. This claim is utterly without merit, for defendant had waived any rights on that ground. The previous jury had, indeed, found Shevchuk guilty of unauthorized use of a motor vehicle, but it had acquitted him of the more serious offense of kidnapping; and, although he was charged with aggravated robbery and aggravated assault, the jury had found him guilty of only the lesser offenses of simple robbery and simple assault. Defendant undoubtedly considered it to be a favorable jury panel under those circumstances. There is no doubt that the Krampotich jury was fully aware of the verdicts of the Shevchuk jury, for virtually all of them acknowledged seeing or hearing them reported in the public media, and defendant's counsel in voir dire made certain that they had that information. The question of standing trial before a jury selected from this panel had been thoroughly discussed with defendant by court and counsel in chambers before trial, and defendant, with the recommendation of his counsel, voluntarily elected to proceed to trial.

Affirmed.