## STATE v. GARY HOGAN.

212 N. W. 2d 664.

November 2, 1973—No. 43032.

*John S. Connolly* and *John L. Connolly,* for appellant.

*Warren Spannaus,* Attorney General, *William B. Randall,* County Attorney, and *Steven C. DeCoster* and *Robert Kittel,* Assistant County Attorneys, for respondent.

KELLY, JUSTICE.

This is an appeal by Gary Hogan, a juvenile, from a conviction in Ramsey County District Court of attempted first-degree murder and aggravated arson. We affirm.

About 5 p.m. on Saturday, August 22, 1970, a bomb exploded in a ladies' restroom in Dayton's department store at Sixth and Cedar in downtown St. Paul, Minnesota. A woman who was in the restroom at the time of the explosion was seriously injured by the blast. Immediately following the explosion, police searched about 100 lockers near the restroom and discovered a brown 18- by 12- by 10-inch satchel containing a second bomb device. It was found in a locker about 30 to 40 feet from the restroom. After the bomb had been disarmed, it was discovered that it had malfunctioned with 25 minutes remaining on the timing device. The unexploded bomb found in the satchel was composed of 10 sticks of dynamite while the damage to the restroom could have been caused by a single stick of dynamite.

Prior to the explosion, at approximately 4:45 p.m., Mrs. Catherine Wiley and her four daughters were seated in a car outside the entrance to Dayton's near the site of the explosion. She observed a black youth dressed as a woman, wearing a long dark

wig, white pants, a beige jacket, and white tennis shoes, enter Dayton's. He was carrying a bag she described as a white, tan, and blue striped plastic bag about 15 to 18 inches deep and 12 inches wide. She stated that this bag was not large enough to hold the satchel which contained the unexploded bomb. A friend of defendant, Phillip Wright, in a statement made to the police, stated defendant had told him on the evening of the bombing that he had dressed like a teenage girl and planted a 3-stick dynamite bomb in Dayton's ladies' restroom. Defendant also had told him that he was unaware of the second bomb discovered in the locker.

Ten days later, on September 1, 1970, about 7 a.m., another bomb exploded in the area of the Second Street viaduct in St. Paul. Two public works employees who were in a truck at Kellogg Boulevard and Wabasha Street heard the explosion and observed smoke from the area. After driving to the site, they observed defendant climb through the railing along the edge of the viaduct. He was full of dust, injured on his head and legs, and was screaming, "I have been bombed." He told the workers, "I have been hurt, I have been hit by shrapnel—take me to the hospital." He also said he had come to the viaduct to meet his girl friend, Barbara, and asked one of the workers to look for her while the other worker took defendant to St. Paul Ramsey Hospital. No trace of the girl was found.

Shortly thereafter, about 7:15 a.m., two police officers talked to defendant in the emergency room at the hospital. Defendant stated he was "blown up" while walking along the street after coming downtown by bus to meet his girl friend. About 8 or 8:30 a.m., two detectives of the police juvenile division talked to defendant after first advising him of his rights. He responded that they did not have to give him his rights because he was a "victim" and repeated his story. He then declined to proceed without a lawyer and the officers left. Another police officer, Officer Francis Whitney, also questioned defendant at about 8:35 a.m. After again being given a Miranda warning, defendant responded that he had already been advised of his rights and re-

peated his previous story. When defendant was taken from the emergency room, Officer Whitney advised him that he was under arrest. At this time, defendant, without being asked a specific question, volunteered this statement: "I suppose you are going to say I brought the dynamite up here from Des Moines." After speaking to his grandmother, he told Officer Whitney he did not wish to speak further and the officer left. Later that day, following surgery, defendant was questioned by the anesthetist in order to determine if he had recovered from the anesthetic and he repeated substantially the same story about the explosion in which he was injured.

The following items were found in defendant's room in the house where defendant lived with his grandmother: (1) A brown cotton jacket and a pair of white corduroy pants; (2) two books —*Mini Manual of Urban Guerilla Warfare* and *Face the Reality America*—and a pamphlet on preparing bombs; (3) a bottle containing lead from a number of .22-caliber bullets; and (4) a plastic can containing gunpowder. A long, black wig was found in another room used by a niece of the grandmother. The manual on urban guerilla warfare advocated the destruction of the armed forces and police, including killing them by use of explosives. One of the diagrams in the pamphlet on making bombs explained how to construct bombs similar to the two Dayton's bombs and the bomb exploded in the viaduct. F.B.I. laboratory personnel testified that the bombs were all of similar components and construction.

On September 11, 1970, the Ramsey County Juvenile Court waived its jurisdiction of defendant and referred him for prosecution as an adult. On September 16, he was indicted for attempted first-degree murder and aggravated arson. Defendant's motion to quash the indictment, based on a challenge to his reference for adult prosecution, was denied on October 2 and a motion for change of venue was denied on December 30. This court denied defendant a writ of mandamus to compel change of venue as well as a writ of prohibition to restrain his prosecution as an

434

adult on December 31, 1970. The United States Supreme Court similarly denied a writ of mandamus to change venue on January 8, 1971. Defendant was found guilty of both charged offenses on March 1, 1971, after 6 days of deliberation by the jury.

■ The first issue raised is whether prejudicial error was committed by allowing evidence of the unexploded bomb to be introduced without a Spreigl notice. While defendant's argument mainly is concerned with the lack of a Spreigl notice, other related questions are raised, i.e., (1) the sufficiency of evidence to establish complicity by defendant in the planting of the unexploded bomb; (2) whether complicity in planting the unexploded bomb has any bearing on defendant's guilt of the crime charged; and (3) whether the jury was appropriately informed of the limited purpose for which evidence of such complicity was admitted.

We dispose of these last three items first. Rather obviously, complicity in planting the unexploded bomb would bear upon the guilt of defendant. He was charged with attempted murder in the first degree and aggravated arson—both are crimes in which intent must be proved. Certainly then, any evidence tending to show defendant's knowledge about explosives and his state of mind should be admissible. Connecting him with the unexploded Dayton bomb would show his state of mind. Obviously, if he participated in the planting of that bomb, which was many times more powerful than the bomb that exploded and which had been set to explode shortly after the first bomb, when police could be expected to be present, then he had a state of mind from which an intent to attempt murder might readily be inferred. Furthermore, proof of his complicity in the planting of the unexploded bomb would preclude any reasonable argument that the exploded bomb was planted to scare but not to kill on the theory that defendant didn't realize just how much of an explosion the smaller bomb might create.

The evidence from which the court and jury might find that the defendant participated in the planting of the unexploded bomb and that such participation was a part of a scheme or plan

as well as a part of the immediate episode of the crime charged is inextricably bound together. There was adequate evidence from which the jury and the trial court might find that defendant had planted the unexploded bomb. As we pointed out in State v. Billstrom, 276 Minn. 174, 149 N. W. 2d 281 (1967), evidence of a defendant's participation in other crimes need not be proved beyond a reasonable doubt but must be clear and convincing. The placing of the two bombs about 35 feet apart in Dayton's; the time set for the explosion of the bigger bomb; the similarity of the component parts and construction of the bombs; defendant's possession of manuals advocating the killing of police and describing how to make bombs like those planted in Dayton's; and defendant's involvement with a similar bomb in the viaduct explosion are circumstances which, considered together, produce clear and convincing proof that defendant participated in the planting of the unexploded bomb. In fact, it would border on the incredible to find that the Dayton bombs were wholly unrelated acts, were not part of the same episode, and were not part of a common plan and scheme. It follows that the defendant must have participated in the planting of the unexploded bomb and that that act was part of a common plan and scheme. This case is the converse of other cases in which the perpetrator of the crime charged is identified by proof of other crimes. Here, the perpetrator of the planting of the unexploded bomb is identified by evidence of the viaduct explosion and of the crime charged. In order to present clear and convincing proof of the planting of the unexploded bomb, the prosecution had to identify the perpetrator and did so by introducing evidence of the relationship in time, location, and modus operandi of the three bomb incidents. In addition to showing the mental state of the defendant, evidence of the unexploded bomb supplies the nexus between the exploded bomb and the manual on killing police by use of explosives. The time of the explosion of the first Dayton bomb, coupled with the time set for the other Dayton bomb to explode and the placing of the bomb near the one that first exploded, gave added

meaning to the discovery in the defendant's room of the manual advocating killing of police and the pamphlet on how to make bombs.

The trial court appropriately charged the jury that evidence of the unexploded bomb was to be considered by the jury for a limited purpose only: That the defendant was not being tried and might not be convicted for any offense related to the unexploded bomb but only for the two offenses specifically set forth in the indictment. Also, that the jury was not to convict the defendant on the basis of the evidence surrounding the finding of the unexploded bomb standing alone because to do so might result in unjust double punishment. With this type of instruction, the defendant should not have been convicted of a crime he was not charged with. This is the rationale of limiting the purpose for which evidence of another crime may be admitted. State v. Whelan, 291 Minn. 83, 189 N. W. 2d 170 (1971). Thus, the trial court, given all of the facts and circumstances of this case, did not err in admitting the evidence concerning the unexploded Dayton bomb.

■ The foregoing answers to the three subsidiary questions are determinative of the contention that a Spreigl notice was required. The unexploded bomb being a part of the same plan or scheme was an integral part of the same criminal episode. Our decision in State v. Spreigl, 272 Minn. 488, 139 N. W. 2d 167 (1965) expressly excluded the requirement of prior notice whenever the evidence is of other offenses which are a part of the same episode for which defendant is being tried. State v. Whelan, *supra.*

■ Defendant had by motion at various stages before trial and by motions before this court and the United States Supreme Court for writs of mandamus attempted to obtain a change of venue from Ramsey County. The grounds for these motions were that pretrial publicity about the bombings and defendant's arrest prevented the impaneling of an impartial jury. The news media coverage of the bombings consisted only of factual articles re-

lating to the incident itself or the pretrial procedure in the prosecution of defendant. The newspaper publicity did not express opinions or refer to evidence of defendant's guilt nor attribute such statements to responsible public authorities. Although one editorial did refer to the Dayton bombing in expressing an opinion that juveniles arrested for such crimes should be treated as adults, it expressed no opinion as to defendant's guilt or innocence nor did it refer to him by name. The greater part of this publicity occurred over 3 months before trial. In addition, the record does not show that the jury, impaneled after 9 days of voir dire examination, was biased against defendant.

The trial court has wide discretion in determining whether the venue of a criminal prosecution should be changed. E.g., State v. Ellis, 271 Minn. 345, 136 N. W. 2d 384 (1965). Before it can be concluded that the trial court has abused this discretion, it must be shown that a real possibility exists that the jury will not render an unprejudiced or unbiased verdict. State v. Annis, 291 Minn. 552, 192 N. W. 2d 419 (1971); State v. Shevchuk, 282 Minn. 182, 163 N. W. 2d 772 (1968). Cf. State v. Thompson, 266 Minn. 385, 123 N. W. 2d 378 (1963). We do not believe that the record here shows that pretrial publicity prevented a fair and impartial trial.

We also reject defendant's argument that a public opinion poll of Ramsey County residents establishes that an impartial jury could not have been selected. The poll included 2 questions on the bombings in a series of 53 questions on matters of public interest. The first question asked if the person had seen or heard "anything" about the bombing, to which 91 percent responded "yes." The second question asked if they believed defendant was guilty, to which 34 percent answered in the affirmative.

Disregarding the suggestive nature of the questions and their weaknesses in showing community views of guilt or innocence, we are not persuaded that the results of this poll establish that the jurors actually seated were biased. We hold that the trial court did not abuse its discretion in denying a change of venue.

■ Defendant also argues that the juvenile court, when it waived jurisdiction and referred him for adult prosecution, exceeded its authority because it was not shown that he was incapable of benefiting from the rehabilitative processes of the juvenile court.

According to our statute, a child over 14 may be referred by a juvenile court for adult prosecution by appropriate authorities if:

"The court finds that the child is not suitable to treatment or that the public safety is not served under the provisions of laws relating to juvenile courts." Minn. St. 260.125, subd. 2(d).

The statute is drafted in the disjunctive requiring either non-amenability to treatment or, in the alternative, a threat to public safety before reference is permissible.

In determining if the public safety would be threatened, among the relevant factors to be considered are: (1) The seriousness of the offense in terms of community protection; (2) the circumstances surrounding the offense; (3) whether the offense was committed in an aggressive, violent, premeditated, or willful manner; (4) whether the offense was directed against persons or property; (5) the reasonably forseeable consequences of the act; and (6) the absence of adequate protective and security facilities available to the juvenile treatment system. See, Mikulovsky v. State, 54 Wis. 2d 699, 196 N. W. 2d 748 (1972); Note, 54 Minn. L. Rev. 389, 404 (1969).

It is doubtful whether an offense which evidences a greater threat to the public safety than that presented by this case can be imagined. Although arguably defendant may have been suitable to treatment through juvenile proceedings, the trial court did not abuse its wide discretion in applying the statutory reference policy by deciding that the nature of the offenses indicated that public safety would not be promoted by treating defendant as a juvenile.

In connection with this issue, defendant also alleges denial of

equal protection in that according to Rule 8-3, Rules of Procedure for Juvenile Court Proceedings, applicable in all counties except Hennepin and Ramsey, a "reference study" is a prerequisite to referral for adult prosecution. Assuming that an equivalent to this procedure was not provided in this case, we recently rejected a similar argument concerning the denial of a jury trial in the first instance in three counties of the state. In City of St. Paul v. Hitzmann, 295 Minn. 301, 305, 204 N. W. 2d 417, 420 (1973), we observed:

" '[T]he Equal Protection Clause relates to equality between persons as such rather than between areas.' * * * [T]his provision of the Fourteenth Amendment 'means that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances.' " [1]

There is no contention here that the reference procedure applied in this case was different than for other juvenile offenders under like circumstances in Ramsey County. We therefore conclude that he was not denied equal protection of the laws in being referred for adult prosecution.

■ The remaining two issues raised by defendant concern the claimed constitutional right of a juvenile to have his parents present during interrogation and the waiver of his Miranda rights. Defendant argues that he was denied equal protection because he was not afforded the same right as juveniles in all counties except Hennepin and Ramsey to have his parents present when informed of his right to remain silent during custodial interrogation. Rule 2-2, Rules of Procedure for Juvenile Court Proceedings. For the reasons discussed previously concerning a reference study, we hold there is no denial of equal protection when defendant has not shown that he was treated differently

---

[1] Quoting Salsburg v. Maryland, 346 U. S. 545. 551, 74 S. Ct. 280, 283, 98 L. ed. 281, 288 (1954).

than other juveniles in Ramsey County. State v. Hitzmann, *supra.*

Defendant also argues, however, that parental presence during waiver of Miranda rights and custodial interrogation is a constitutional prerequisite to the admissibility of statements made during such questioning. In our decision of State v. Loyd, 297 Minn. 442, 212 N. W. 2d 671 (1973), we rejected a rule which would exclude all statements made by a juvenile merely because the juvenile court has not yet waived its jurisdiction and referred the juvenile for adult prosecution. We adopted instead a rule which would permit the use of such statements if the child is not misled in the confidential atmosphere of the juvenile court.

Defendant here makes the additional argument for a per se exclusionary rule whenever Miranda rights are waived and a statement is given by a juvenile in the absence of a parent or guardian. Although we recognize that the presence of parents and their guidance during interrogation of a juvenile is desirable, we reject the absolute rule that every minor is incapable and incompetent as a matter of law to waive his constitutional rights. In determining whether a juvenile has voluntarily and intelligently waived his constitutional rights, parental presence is only one factor to consider and is not an absolute prerequisite. We hold that the determination whether a waiver of rights is voluntarily and intelligently made by a juvenile is a fact question dependent upon the totality of the circumstances. The child's age, maturity, intelligence, education, experience, and ability to comprehend are all factors to be considered in addition to the presence and competence of his parents during waiver.[2] In re Gault,

---

[2] State v. Hardy, 107 Ariz. 583, 491 P. 2d 17 (1971); People v. Lara, 67 Cal. 2d 365, 62 Cal. Rptr. 586, 432 P. 2d 202 (1967), certiorari denied, 392 U. S. 945, 88 S. Ct. 2303, 20 L. ed. 2d 1407; State v. Oliver, 160 Conn. 85, 273 A. 2d 867 (1970); State v. R. W. 115 N. J. Super. 286, 279 A. 2d 709, (1971); People v. Stephen J. B. 23 N. Y. 2d 611, 298 N. Y. S. 2d 489, 246 N. E. 2d 344 (1969); Story v. State, 452 P. 2d 822 (Okla. Cr. 1969); Commonwealth v. Moses, 446 Pa. 350, 287 A. 2d 131 (1971); O'Neil v. State,

387 U. S. 1, 55, 87 S. Ct. 1428, 1458, 18 L. ed. 2d 527, 561 (1967), although concerned primarily with the adjudicating stages of juvenile proceedings, also indicates that while waiver of privileges by children may differ somewhat in technique, it does not differ in principle from waivers by adults.

In the present case, defendant was 15 years old and of suitable intelligence and maturity to understand his rights. His complete willingness, indeed determination, to establish his largely exculpatory story about being a victim of the bombing demonstrates that, considering the entire circumstances of his statements, he voluntarily told the story. Furthermore, it is doubtful whether the initial statements to the police after arriving at the hospital were made under custodial interrogation. At this time defendant was not a suspect and in fact continued to declare himself a victim. Spontaneous statements not made in response to interrogation are admissible. State v. Morris, 290 Minn. 523, 187 N. W. 2d 276 (1971); Jankord v. State, 290 Minn. 168, 186 N. W. 2d 530, certiorari denied, 404 U. S. 942, 92 S. Ct. 292, 30 L. ed. 2d 257 (1971).

Finally, assuming all the statements to the police were improper, their use would not be prejudicial because defendant had told the apparently prerehearsed story to the public works employees before police questioning.

Affirmed.

MR. JUSTICE YETKA and MR. JUSTICE SCOTT, not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

455 S. W. 2d 597 (Tenn. Cr. App. 1970); Jarrett v. State, 500 P. 2d 1027 (Wyo. 1972). Contra, Lewis v. State, 288 N. E. 2d 138 (Ind. 1972).